**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 30 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RUFUS A. CALDWELL, III,

      Plaintiff - Appellee/
      Cross-Appellant.

v.

      (Nos. 00-3256, 00-3288)

LIFE INSURANCE COMPANY OF
NORTH AMERICA,

      Defendant - Appellant/
      Cross-Appellee.

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 93-CV-2550-GTV)**

Richard N. Bien (R. Kent Sellers, with him on the briefs), Lathrop & Gage L.C., Kansas City, Missouri, for Defendant-Appellant/Cross-Appellee.

Michael W. Blanton, Blue Springs, Missouri (William P. Ronan, III, Overland Park, Kansas, on the briefs), for Plaintiff-Appellee/Cross Appellant.

Before **SEYMOUR** and **PORFILIO**, Circuit Judges, and **STAGG**,[*] District Judge.

---

    [*] The Honorable Tom Stagg, United States District Judge, Western District of Louisiana, sitting by designation.

**SEYMOUR**, Circuit Judge.

This case deals with whether disability benefits should be provided to Rufus Caldwell by Life Insurance Company of North America (LINA). LINA denied Mr. Caldwell's claim for both "own occupation" and "any occupation" long-term total disability benefits.[1] On review, the district court upheld LINA's determination as to "any occupation" benefits, but held that Mr. Caldwell is entitled to "own occupation" benefits for disability resulting from injuries suffered while working for Western Atlas International (Western Atlas).[2] It also awarded prejudgment interest to Mr. Caldwell. We affirm in part and reverse in part.

**I**

---

[1] This opinion involves many definitions of "disability," reflecting the varying standards used by different federal and state agencies and private actors. The standard we use in determining the outcome of this case is that set by LINA's long-term disability benefits policy. According to LINA's policy, "own occupation" benefits are available to an employee for up to two years after sickness or injury if the employee is unable to perform all the essential duties of *his* job at the time of injury. App. vol. II at 513. "Any occupation" benefits are available to an employee if, after the first twenty-four months of disability, the employee "is unable to perform all the duties of *any* job for which he is, or may become, reasonably qualified based on his education, training or experience." *Id.*

[2] After deducting earnings and benefits Mr. Caldwell had received from other sources, the district court awarded him $16,793.41 in short term disability benefits.

From November 3, 1975 until April 28, 1989, Rufus Caldwell was employed by Western Atlas International ("Western Atlas"), an oil drilling services company. Mr. Caldwell held a number of positions during his tenure at Western Atlas, including rig hand, completion engineer, senior completion engineer, and customer service representative. In the last of these jobs, which he held at the time of his accident, he was required to perform the relatively sedentary duties of a normal customer service representative, as well as a variety of more physically-demanding tasks. Western Atlas listed Mr. Caldwell's duties as involving sitting (75%), walking (10%), standing (8%), bending (5%), reaching (1%), and stooping (1%). App. vol. II at 294. The company also stated that Mr. Caldwell was occasionally required to carry, push, pull and lift objects weighing between 50 and 100 pounds for distances of 20 to 30 feet. *Id.*

Mr. Caldwell described his job as follows in his deposition:

Q. At the time you suffered that injury in January of 1989, what was your title, the title of your position?
A. Customer service representative.
Q. Was there a job description that you are aware of for that position?
A. It was PR-type work.
Q. What do you mean by that?
A. If they had trouble on a location, I was supposed to go out and please the company we were working for and see what we had to do to make the job right.
Q. That was your job title and the duties that you understood that you were to do; is that correct?
A. Yes, sir. That, and I did a little bit of selling, but not much.

3

Q. In actuality, did you have *other duties* that were required of you, other than those you have just described?
A. *I ran a relief truck, if they didn't have enough engineers; if they didn't have enough rig hands, I had to rig.*
Q. What do you mean you ran a relief truck?
A. They used me as a relief engineer, logging and perforating.
Q. Tell me what kinds of physical activities you would be involved in?
A. *Rigging was lifting anything from a 25-pound gun to a 450-pound gun.*
Q. *What other physical activities would you have to do?*
A. *Help rig up and help rig down, all the work that goes with the job.*

*Id.* vol. V at 1159-60 (emphasis added). Mr. Caldwell also testified:

Q. What would happen if you didn't do those things that you have described to act as a rig hand or run a relief truck?
A. I would have been relieved of my job.
Q. Was that made clear to you?
A. Yes, sir.

*Id.* at 1162. Most significantly for present purposes, the company required Mr. Caldwell to lift and move heavy objects with some regularity, including anything from a 30-pound logging tool to his share of a 450-pound perforating gun. *Id.* at 1110; *see also id.* at 1160. It is undisputed that Western Atlas expected Mr. Caldwell to fulfill the non-sedentary duties of other positions, especially that of rig hand, as needed by the company.

Oil drilling is a physically demanding job that results in a great number of on-the-job injuries. Mr. Caldwell's medical history demonstrates the toll the work took on his body. He suffered repeated injuries throughout his decade and a half with Western Atlas that caused him chronic neck, back, knee, and elbow pain. On

4

January 31, 1989, Mr. Caldwell was injured while fulfilling rig hand duties at a drilling site. *Id.* at 1159 ("I was going to help my hand rig down; we were shorthanded."). He was descending from a truck when he caught the toe of his boot on a step and fell to the ground. As a result of the fall Mr. Caldwell suffered a chip fracture and severe sprain in his ankle. He went to Dr. L.T. Fleske, who placed his ankle in a cast. Mr. Caldwell was on crutches during the time he wore the cast. Dr. Fleske removed the cast on February 20th and by March 6th allowed Mr. Caldwell to discontinue use of the crutches. Nevertheless, pain and swelling in his ankle did not subside.

In seeming contradiction to the claim that he was disabled, Mr. Caldwell did not miss any work in the months after he was injured. However, he testified that Western Atlas had him come to work to perform only the sedentary duties of his job. Thus, Mr. Caldwell testified in his deposition that "[w]hile I was in the cast, I did customer service work; and after the cast was off, I did what little I could do around the shop. If they would tell me to do what I couldn't do, I didn't do it." *Id.* at 1168. He also testified that, at the time he was laid off, he was not able to do the part of his job that required lifting. *Id.* at 1209. This evidence is not disputed.

On April 28, Western Atlas terminated Mr. Caldwell. His ankle pain persisted in July when Dr. Fleske saw him for the last time and recommended that

5

he continue physiotherapy and see a bone specialist in Oklahoma City, closer to his home. On July 6, 1989, Mr. Caldwell saw Dr. Larry White in Oklahoma City. Dr. White noted that Mr. Caldwell continued to suffer a "great deal" of ankle pain and was suffering constant low back pain that worsened with activity. *Id.* vol. III at 774. The ankle swelling and pain still persisted in November, at which time Dr. Glenn Smith concluded that Mr. Caldwell had a permanent disability due to the loss of range of motion and chronic pain in his ankle. *Id.* at 766-67. The doctor advised Mr. Caldwell that he would not be able to return to the type of employment that he had prior to the injury. *Id.*

Mr. Caldwell subsequently spent a year working as a self-employed truck driver, delivering materials to drilling sites after Western Atlas terminated him. The job required no heavy lifting, and he discontinued this business when his doctors ordered him to do so, because even driving aggravated his back problems.

LINA, a division of CIGNA Corporation, provided life insurance and disability coverage to employees of Western Atlas. LINA was both the administrator and insurer of the plan. In March 1994, after learning about the disability policy, Mr. Caldwell filed a claim with LINA for disability benefits and also added LINA to the present federal court action that he had pending against

Western Atlas for wrongful discharge.[3]  Under the policy held by Western Atlas,

LINA was required to pay "own occupation" disability benefits to an employee for

the first twenty-four months after sickness or injury if the employee was "unable

to perform all the essential duties of his occupation." *Id.* vol. II at 277.  LINA

denied Mr. Caldwell's claim in July 1995 on grounds that he had failed to

establish he was totally disabled within the meaning of the "own occupation"

provision of LINA's policy.  This determination accordingly precluded Mr.

Caldwell's claim for "any occupation" disability benefits as well.[4]  Mr. Caldwell

appealed the denial to the district court, which held that LINA had not conducted a

full and fair review of the claim and remanded it for further administrative

proceedings.  *Caldwell v. Life Ins. Co. of N. Am.*, 959 F.Supp. 1361, 1367-69

(D.Kan. 1997)(*Caldwell I*).

LINA conducted a second review of the claim and, in a letter dated October

24, 1997, it again denied Mr. Caldwell both "own" and "any occupation" disability

benefits.  On review of this second denial, the district court held the LINA

---

[3]  Mr. Caldwell originally filed this action against Western Atlas claiming *inter alia* retaliatory discharge because his repeated on-the-job injuries resulted in worker's compensation claims.  Mr. Caldwell was first told by Western Atlas of the LINA disability plan during discovery.  After learning of the coverage available to him, Mr. Caldwell filed a claim with LINA for disability benefits and, at the same time, amended his complaint to add LINA as a party to this lawsuit.  The claims against Western Atlas were settled and the company was dismissed from the suit.

[4]  *See supra* note 1.

administrator's decision was arbitrary and capricious as to "own occupation" benefits. The court determined Mr. Caldwell was, in fact, disabled from performing all the essential duties of his own occupation at the time he was fired by Western Atlas, and that this disability continued through January 31, 1991. *Caldwell v. Life Ins. Co. of N. Am.*, 37 F.Supp.2d 1254, 1261-62 (D.Kan. 1998) (*Caldwell II*). The court affirmed the administrator's decision denying "any occupation" benefits for the period thereafter. *Id.* at 1262.

On appeal, LINA raises two issues. First, it claims the district court erred in reversing the LINA administrative decision as arbitrary and capricious because, LINA maintains, the district court misapplied the sliding scale standard of deference applicable to administrative decisions. Second, LINA claims the district court abused its discretion in awarding prejudgment interest to Mr. Caldwell. Mr. Caldwell cross-appeals the district court's decision to affirm LINA's denial of "any occupation" benefits.

## II

LINA first challenges the district court's reversal of its administrator's decision to deny Mr. Caldwell's "own occupation" disability claim. Specifically, LINA maintains the court failed to properly analyze the nature and effect of LINA's conflict of interest as the administrator.

The district court used an arbitrary and capricious standard in analyzing LINA's denial of benefits. *Caldwell II*, 37 F.Supp.2d at 1256. Mr. Caldwell does not challenge this determination on appeal. The district court's determination of whether an ERISA benefits decision is arbitrary and capricious is a legal conclusion subject to *de novo* review. *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).

Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary. *Id.* at 380 n.4; *Charter Canyon*, 153 F.3d at 1135. Substantial evidence is "'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].'" Sandoval, 967 F.3d at 382 (quoting *Flint v. Sullivan*, 951 F.2d 264, 266 (10th Cir. 1991) (alteration in original)). Substantiality of the evidence is based upon the record as a whole. In determining whether the evidence in support of the administrator's decision is substantial, we must "'take[] into account whatever in the record fairly detracts from its weight.'" *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994) (quoting *Nieto v. Heckler*, 750 F.2d 59, 61 (10th Cir. 1984)); *see also Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). We give less deference if a plan

9

administrator fails to gather or examine relevant evidence. *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999). Moreover, if a conflict of interest exists, the reviewing court "must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996); *see also Pitman v. Blue Cross & Blue Shield of Oklahoma*, 217 F.3d 1291, 1297 (10th Cir. 2000).

The district court held that the LINA administrator's decision was entitled to some deference, but that deference would be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict it found. *Caldwell II*, 37 F.Supp.2d at 1256. LINA is both the administrator and insurer of the Western Atlas disability plan. As such, an inherent conflict exists. *Pitman*, 217 F.3d at 1296. LINA does not deny that under our case law it was operating under a conflict. Rather, relying on our decision in *Kimber,* it contends the district court failed to make the required analysis of the nature or severity of that conflict. *See* 196 F.3d at 1097-98. We need not address this issue because we conclude that the LINA administrator's decision is arbitrary and capricious without regard to the conflict.

Under LINA's policy, "own occupation" disability occurs when an employee is "unable to perform all the essential duties of his occupation." App. vol. II at

10

277. Payments begin only when LINA receives "due proof that: (1) the employee [became] Totally Disabled while insured for this Long-Term Disability Insurance; and (2) his Total Disability has continued for a period longer than the Benefit Waiting Period shown in the Schedule." *Caldwell II*, 37 F.Supp.2d at 1258 (quoting LINA policy). LINA's decision to deny Mr. Caldwell's disability claim[5] rested on three main sources: the findings and conclusions of the administrative law judge in Mr. Caldwell's worker's compensation case; the findings and conclusions stemming from his Social Security disability claim; and Mr. Caldwell's medical records. We analyze each of these sources separately.

The administrative law judge, in denying Mr. Caldwell's worker's compensation claim under the applicable Kansas scheme, determined Mr. Caldwell was never "temporarily totally disabled." The judge pointed to the fact that Mr. Caldwell returned to work with an ankle cast in February and continued working until he was fired on April 28, 1989. The LINA administrator's decision letter quoted the ALJ's determination that "Claimant testified that he was capable of performing the duties of a customer service representative," that he worked up until the time of his departure, and that his condition substantially worsened following his departure from Western Atlas. App. vol. IV at 827. LINA also

---

[5] We refer to the second time LINA denied Mr. Caldwell's claim, after remand by the district court. *See supra* page 7.

11

relied on the Social Security administrative decision finding that Mr. Caldwell became totally unable to work on August 18, 1990, which was more than a year after he left Western Atlas.

The district court held the findings and conclusions of the two administrative proceedings irrelevant to Mr. Caldwell's ability to perform his *own* job duties when employed by Western Atlas. We agree. Significantly, the Kansas Workers' Compensation Act stated during the relevant time period that "[t]emporary total disability exists when the employee, on account of the injury, has been rendered completely and temporarily incapable of engaging in *any* type of substantial and gainful occupation." KAN. STAT. ANN. § 44-510c(b)(2) (1989 Supp.) (emphasis added). As we have pointed out, the relevant LINA standard for "own occupation" disability is whether Mr. Caldwell was capable of performing his *own* job at Western Atlas on April 28, 1989. The LINA administrator admitted that she based her decision in part on the determination of the workers' compensation judge, app. vol. I at 122, despite not knowing "what the standard was in Kansas in 1989 for qualifying for temporary total disability benefits," *id.* at 123.

The Social Security hearing on which the LINA administrator relied in denying "own occupation" benefits to Mr. Caldwell was also aimed at determining Mr. Caldwell's ability to perform *any* job for which he was qualified. The LINA

12

administrator's reliance on the workers' compensation and social security decisions to deny "own occupation" benefits was thus arbitrary and capricious given that each such determination relied on irrelevant standards that conflicted with the LINA policy definition of "own occupation" disability.

The LINA administrator also ignored evidence that was relevant to her decision. A key determination in the inquiry before the administrator was whether Mr. Caldwell could perform all the essential duties of his job at the time he left Western Atlas. Mr. Caldwell does not deny that he could perform the normal duties of a customer service representative on April 28, 1989. As we have noted, however, it is undisputed that Western Atlas required Mr. Caldwell to perform more than just those sedentary duties. Mr. Caldwell presented unrefuted evidence of his heavy lifting duties. Western Atlas itself described the customer service representative job on a form as requiring "occasionally" (more than "seldom") the carrying, pulling, pushing, and lifting of 50 to 100 pounds; and as working "with/near dangerous machinery," *i.e.*, "oilfield service rigs." *Id.* vol. II at 294.

The LINA administrator testified that she was aware Mr. Caldwell's customer service job occasionally required lifting and carrying 50 to 100 pounds. *Id.* at 122. She further testified that she assumed he could fulfill the lifting and carrying requirements of his job, *id.*, having relied on the Workers' Compensation judge's determination that Mr. Caldwell was not disabled during the relevant time

13

period. In making this determination, the LINA administrator failed to assess all of the relevant evidence. In her determination letter, the administrator said that she had reviewed, among other things, "[t]ranscripts of the Worker's Compensation Deposition of Mr. Caldwell taken on 4/30/91 and 7/26/91." *Id.* vol. IV at 826. However, those records include Mr. Caldwell's testimony that Western Atlas required him to perform the duties of a rig hand when they were shorthanded, that he was performing those very duties when he injured his ankle in January 1989, and that the rig hand duties required heavy lifting he could not do after his ankle injury. Despite having this unrefuted evidence before her, the LINA administrator concluded "Mr. Caldwell has not established that he was unable to perform all the essential duties of his occupation as a Customer Service Representative either as of 1/31/89 or 4/28/89." *Id.* vol. IV at 830.

The LINA administrator also based her decision on a skewed reading of Mr. Caldwell's medical records. Her decision relied almost exclusively on the medical records of Dr. L.T. Fleske, who treated Mr. Caldwell at the time of his injury. Specifically, the administrator stated that Dr. Fleske's medical records do not support the conclusion that Mr. Caldwell was unable to return to his job as a customer service representative. She noted that Dr. Fleske placed no restrictions on Mr. Caldwell's activities as a customer service representative, and that years after he stopped treating Mr. Caldwell, Dr. Fleske wrote LINA: "From treating that

14

type of problem [Mr. Caldwell] would be off work for a brief period of time but should not be totally or permanently disabled." *Id.* at 828.

A closer review of the record reveals the questionable worth of Dr. Fleske's records and opinions with regard to the issue before us. Nowhere in the record does it indicate that Dr. Fleske was aware of the full range of duties Western Atlas required of Mr. Caldwell. A release to work without clear knowledge that Mr. Caldwell had to engage in heavy lifting does not provide substantial evidence that Mr. Caldwell could perform *all* the essential duties of his job.

Further undermining LINA's reliance on Dr. Fleske's records and testimony is the fact that Dr. Fleske's care of Mr. Caldwell was brief. Mr. Caldwell saw Dr. Fleske regarding his ankle for the first time on February 8, 1989. Significantly, on July 24, 1989, Dr. Fleske recommended that Mr. Caldwell seek help from a doctor in Oklahoma City for his continuing ankle problems. Doctor and patient never saw each other again as a series of other doctors took over Mr. Caldwell's treatment. Drs. White and Smith, the doctors who treated Mr. Caldwell immediately following Dr. Fleske, noted that Mr. Caldwell suffered chronic ankle pain. App. vol. III at 767, 774. Dr. Smith concluded that Mr. Caldwell's continuing pain prevented him from engaging in the type of work he was doing at Western Atlas prior to his surgery. *Id.* at 766-67. In other words, contrary to the finding of the LINA administrator, the medical evidence clearly shows that the

15

problem for which Dr. Fleske treated Mr. Caldwell did not resolve itself in March but rather continued long after Mr. Caldwell's dismissal from Western Atlas in April 1989. The LINA administrator did not mention either Dr. Smith, to whom Mr. Caldwell was referred by Dr. Fleske, or Dr. White in the final decision denying "own occupation" disability benefits. We have recognized that "deference is decreased when a plan administrator fails to gather or examine relevant evidence." *Kimber*, 196 F.3d at 1097.

The LINA administrator also misconstrued Mr. Caldwell's testimony. The decision correctly states Mr. Caldwell testified that Dr. Fleske released him to work in March 1989 and that Mr. Caldwell understood the release to be for "light duty." App. vol. IV at 829. The decision also quotes Mr. Caldwell as stating that he could "do the customer service work," and, in response to a question from an attorney for the insurance company, agreed that he could "do the work that went along with [his] job title." *Id.* (quotation omitted). Taken out of context, of course, Mr. Caldwell's own statements seem to undermine his contention that his disability prevented him from performing his job on April 28, 1989. When viewed in light of the entire record, however, his statements are wholly consistent with the assertion that he could not perform all the essential duties Western Atlas expected him to perform. He *could* perform the sedentary duties of a customer service

16

representative, but *not* those of a rig hand, the very duties he was performing on the day he was injured.

Our de novo review of the record supports the conclusion that Mr. Caldwell was unable to meet the rigors of the rig hand position after his injury on January 31, 1989. Mr. Caldwell visited one doctor after another who confirmed what Dr. Fleske observed at the time of the accident: serious ankle pain. That the disabling pain continued, and even grew worse, in the months following Western Atlas' firing of Mr. Caldwell tends to support the view that Mr. Caldwell could not perform all the essential duties of his job at Western Atlas after his injury in January. The LINA administrator's conclusion to the contrary is not supported by substantial evidence. In short, we agree with the district court, especially in light of the LINA administrator's inappropriate reliance on the workers' compensation and social security decisions and her failure to consider all the evidence in the record, that the decision denying Mr. Caldwell "own occupation" disability benefits was arbitrary and capricious.

### III

LINA also challenges the district court's award of prejudgment interest to Mr. Caldwell. We review prejudgment interest awards for an abuse of discretion. *Malloy v. Monahan*, 73 F.3d 1012, 1019 (10th Cir. 1996); *Eastman Kodak Co. v.*

*Westway Motor Freight, Inc.*, 949 F.2d 317, 321 (10th Cir.1991). An abuse of discretion is "'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999) (quoting *FDIC v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir. 1994)). A two-step analysis governs the determination of such an award. "The district court must first determine whether the award of prejudgment interest will serve to compensate the injured party. Second, even if the award of prejudgment interest is compensatory in nature, the district court must 'still determine whether the equities would preclude the award of prejudgment interest.'" *Eastman Kodak Co.*, 949 F.2d at 321 (quoting *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1257 (10th Cir. 1988)).

The district court held here that the loss to Mr. Caldwell began when he failed to receive each of the monthly benefits to which he was entitled. The court then concluded that "the award of prejudgment interest serves a compensatory function, in that it compensates plaintiff for the loss of the use of the money involved in the award of benefits. The court also concludes that the award is eminently fair because it is an essential component of full compensation for plaintiff." App. vol. I at 265. On this basis, the court awarded prejudgment interest to begin as of August 1989.

18

LINA challenges this determination in two ways. It contends the district court abused its discretion by awarding any prejudgment interest because it failed to consider that damages in the case were difficult to ascertain and that Mr. Caldwell contributed to the delay by filing his claim five years after his accident and then failing to provide medical documentation in a timely fashion. In the alternative, LINA argues that prejudgment interest should only be awarded from the date of the final benefits determination, October 24, 1997.

As to the first claim, this type of ERISA case inevitably involves complex determinations. If we were to find for that reason that equitable considerations favor insurance companies, no plaintiff would ever receive prejudgment interest. In addition, while Mr. Caldwell did not file his claim with LINA until April 1994, almost five years after he was fired by Western Atlas, his former employer did not inform him of the availability of the LINA disability benefits until March 1994. In other words, Mr. Caldwell diligently filed a claim once he knew he could do so. While the delays LINA alleges may be a factor in the appropriate starting time for prejudgment interest, as we discuss below, the fact that the court did not find those delays to warrant a total denial of prejudgment interest does not amount to an abuse of discretion.

As to LINA's alternate argument that interest should be awarded from October 24, 1997, rather than August 1989, the rule in this circuit is that

19

prejudgment interest is generally available "'to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment.'" *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1554 (10th Cir. 1992) (quoting *U.S. Indus., Inc.*, 854 F.2d at 1256). The question in a case such as this is what constitutes the "time of loss." The district court found that the time of loss began in August 1989 when Mr. Caldwell failed to receive the first monthly benefits to which he was entitled. The court held that "[p]rejudgment interest, therefore, should run on each monthly award of benefits from the time such benefit became due until the judgment as modified by this order entered." App. vol. I at 266-67.

The First Circuit, ruling on this very point, held under ERISA that a cause of action and prejudgment interest both accrue when the fiduciary first *denies* a claim. *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 223-24 (1st Cir. 1996). The Eighth Circuit, in a similar case, held that prejudgment interest compensates assignees as if the plan had paid benefits when the employee first *filed* his or her claim. *Lutheran Med. Ctr. of Omaha v. Contractors, Laborers, Teamsters & Eng'rs. Health & Welfare Plan*, 25 F.3d 616, 623 (8th Cir. 1994). It was this latter case to which the district court cited in holding as it did.

Mr. Caldwell did not file a claim with LINA until five years after his injury. This delay was due to Western Atlas' failure to inform him of the availability of

20

disability benefits through the LINA plan, rather than any delay caused directly by LINA. To award prejudgment interest as far back as 1989, therefore, would penalize a party not responsible for the delay. Consequently, we are persuaded the district court abused its discretion in ruling as it did. Under the circumstances of this case, the equities preclude the award of prejudgment interest for five years prior to the time the insurance company was notified of the claim.

LINA maintains that Mr. Caldwell should receive prejudgment interest only back to the time his claim was denied, in accordance with the First Circuit rule.[6] We find the Eighth Circuit's rule in *Lutheran Medical* the more persuasive. The policy that underlies awarding prejudgment interest seeks to make persons whole for the loss suffered because they were denied use of money to which they were legally entitled. Because we hold that Mr. Caldwell was legally entitled to "own occupation" disability benefits, he was entitled to those benefits as of the date he filed his claim. Consequently, prejudgment interest should run from the date the claim for benefits was first filed, April 25, 1994.

Finally, LINA maintains the district court abused its discretion in calculating the rate of interest applied to the prejudgment interest award. The

---

[6] LINA contends in its briefs that were we to follow the First Circuit rule, the date of loss would be October 24, 1997. *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 223-24 (1st Cir. 1996). However, LINA first denied Mr. Caldwell's claim on July 25, 1997, and only made the second denial on remand from the district court.

court looked at post-judgment rates for the period from August 1989 to July 1991, the period during which it found plaintiff entitled to prejudgment interest, determined that rates varied from 8.7% to 6.09%, and set a single rate of 8%.

LINA urged the court to apply the rate of interest as determined by 28 U.S.C. § 1961(a). We decline to follow its suggestion. Section 1961 applies to post-judgment interest, and the district court was not bound by its strictures. Many circuits have held that courts are not required to use section 1961 in calculating prejudgment interest and that the calculation rests firmly within the sound discretion of the trial court. *Taxman v. Bd. of Educ.*, 91 F.3d 1547, 1566 (3d Cir. 1996); *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 310 (2d Cir. 1987); *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 579 (6th Cir. 1984). We now join them. In setting the interest rate at 8%, the district court did not abuse its discretion. In light of our holding that prejudgment interest should run from April 25, 1994, however, we remand to the district court to calculate a new rate of interest for the relevant time period.

**IV**

On cross-appeal, Mr. Caldwell maintains the district court erred in affirming LINA's denial of "any occupation" benefits in two ways. First, he contends the court failed to take into account LINA's failure to consider vocational or

22

occupational evidence.  Second, he argues the court improperly applied the "any occupation" standard.[7]

The LINA administrator's October 24, 1997 denial letter makes no specific findings regarding whether Mr. Caldwell is entitled to "any occupation" benefits, no doubt because the administrator had already concluded Mr. Caldwell did not meet the less onerous "own occupation" standard.  In other words, within the logic of her decision, analysis of Mr. Caldwell's "any occupation" benefits claim was unnecessary.

Despite the LINA administrator's lack of analysis, the district court upheld her implied denial of "any occupation" benefits, concluding that, "substantial evidence supports defendant's determination that plaintiff was not entitled to benefits after January 31, 1991."  *Caldwell II*, 37 F.Supp.2d at 1262.  The district court based its conclusion on the administrator's reliance in her "own occupation" analysis on Mr. Caldwell's medical records, his post-termination employment as a truck driver, and his admissions as to his ability to work.  Specifically, the district

---

[7]LINA asserts that we need not reach the merits of Mr. Caldwell's claims. Pointing to Tenth Circuit Rule 28.2(C)(2) as well as our decisions in *United States v. Heckard*, 238 F.3d 1222, 1230 (10th Cir. 2001), and *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1540 n.3 (10th Cir. 1996), it argues that Mr. Caldwell failed to raise these issues below and thus did not preserve them for appeal.  The record demonstrates, however, that Mr. Caldwell specifically presented and discussed the issue of vocational evidence below and also presented arguments on the "any occupation" issue.  We thus decline LINA's invitation to dismiss these issues on procedural grounds.

23

court pointed to the fact that on multiple occasions Mr. Caldwell admitted he was capable of driving a truck at the time he was terminated and performing the normal duties of a customer service representative.

> Plaintiff's admissions establish that he was able to perform the essential duties of various occupations for which he was qualified. Furthermore, defendant's denial is supported by plaintiff's ability to start and run an oil field hauling business shortly after he was laid off and less than a year after he was injured.

*Id.* at 1262.

We conclude the district court erred in reaching the merits of Mr. Caldwell's "any occupation" claim. ERISA section 1133(1) requires that a claims administrator provide adequate notice to any participant whose claim has been denied, "setting forth the specific reasons for such denial. . . ." 29 U.S.C. § 1133(1). No such reasons appear in the LINA administrator's letter. The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation. *See Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996); *see also Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993). A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, *Weaver*, 990 F.2d at 159, or "the case is so clear cut that it would be

24

unreasonable for the plan administrator to deny the application for benefits on any ground." *Gallo*, 102 F.3d at 923 (citing *Weaver*, 990 F.2d at 159). Neither of these exceptions is satisfied here because there is disputed evidence regarding whether Mr. Caldwell became totally disabled from performing "any occupation" due to the injuries he received while working at Western Atlas or from subsequent injuries.[8] Such a determination requires interpretation of the LINA plan term and further findings of fact. We therefore remand the case to the district court to remand to the LINA administrator for a full and fair review of the record in light of the "any occupation" standard.

Relevant to LINA's review on remand is an issue raised by Mr. Caldwell on appeal. Mr. Caldwell contends that a claims administrator must consider vocational evidence when assessing a claim for disability benefits under an "any occupation" standard, and that the LINA administrator's failure to do so makes her decision arbitrary and capricious. Whether an administrator must consider such evidence is a question of first impression in this court.

---

[8] We question the district court's holding on this issue in light of the fact that the terms of the LINA "any occupation" plan are quite unclear. While it is true that Mr. Caldwell was able to perform the duties of a truck driver in the time between January 31, 1989 and January 31, 1991, this does not necessarily preclude a finding that his disability prevented him from performing "any occupation" *after* January 31. 1991. In fact, given the Social Security determination of total disability as of August, 1990, there is certainly evidence that Mr. Caldwell was, in fact, unable to perform "any occupation" on January 31, 1991.

Determining whether a claimant's disability is so serious as to prevent him from performing, under LINA's standard, "any occupation for which he is or may reasonably become qualified based on his education, training, or experience," App. vol. II at 513, requires a complicated evaluation of a claimant's abilities, skills, and education as well as an assessment of the labor market in the claimant's geographic region. Vocational evidence – most typically from a vocational expert – regarding how the employee's impairment effects his ability to perform jobs other than that held prior to the onset of disability is often helpful in making this evaluation. What Mr. Caldwell asks us to do is hold that such evidence be *required* before an administrator determines whether or not a claimant is indeed disabled under the "any occupation" standard.

To date, five other circuits have ruled on this question. Not one has held such evidence to be the *sine qua non* of an "any occupation" evaluation in all cases. Rather, the courts have consistently allowed for a case-by-case determination of whether a vocational or occupational assessment is required when deciding whether a claimant is able to perform "any occupation" as that term is defined by the insurer's policy. *See Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420-21 (1st Cir. 2000) (vocational assessment not necessary in light of substantial medical evidence and conclusions of reviewing physicians that claimant had no more than minor restrictions on her ability to

work); *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (administrator under no obligation to undertake full-blown vocational evaluation of claimant's job and abilities, but has duty to make reasonable inquiry into type of skills possessed by claimant and whether skills may be used at another job in the same salary range); *McKenzie v. Gen. Tel. Co. of California*, 41 F.3d 1310, 1317 (9th Cir. 1994) (consideration of vocational evidence unnecessary where evidence in record supports conclusion that claimant does not have impairment preventing him from performing some identifiable job); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994) (reviewing court determines on case-by-case basis whether, under particular facts, plan administrator abused discretion by not obtaining opinion of vocational rehabilitation expert). *But compare Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 (8th Cir. 1989) (plan should not have terminated claimant's benefits without aid of qualified opinion from vocational expert), *with Potter v. Connecticut Gen. Life Ins. Co.*, 901 F.2d 685, 686 (8th Cir. 1990) (no need for introduction of vocational expert testimony in light of substantial other evidence claimant not disabled).

Persuaded by their reasoning, we join our sister circuits in holding that whether a claims administrator must consider vocational or occupational evidence in reaching its determination to deny a claimant "any occupation" benefits depends

27

on the circumstances of the particular case and the terms of the benefits plan.  If a claims administrator can garner substantial evidence to demonstrate that a claimant is, in fact, able to perform other occupations (within the definition set out by the insurer) in the open labor market, then consideration of vocational expert evidence is unnecessary.

It is important to note that our decision today does *not* hold that vocational evidence is *never* required.  Rather, we hold that a plan administrator is not required "'in *every case* where the 'any occupation' standard is applicable to collect vocational evidence in order to prove there are available occupations for the claimant.'"  *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1141 n.6 (9th Cir. 2001) (construing and quoting *McKenzie*, 41 F.3d at 1317).

## V

In sum, we **AFFIRM** the determination of the district court as to Mr. Caldwell's "own occupation" disability claim, we **REVERSE** as to its calculation of the date from which prejudgment interest is owed, and we **REMAND** for a new calculation of the rate of prejudgment interest in accordance with this opinion. With respect to the cross-appeal, we **REVERSE** the district court's determination as to Mr. Caldwell's "any occupation" disability claim and **REMAND** to the

district court with instructions that it **REMAND** the matter to the LINA claims administrator for further findings of fact pursuant to the plan's standard for "any occupation" disability.