**Wendy L. HALLFORD, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. 3:04CV109RVMD.**

United States District Court,
N.D. Florida,
Pensacola Division.

March 11, 2005.

Robert T. Bleach, Soloway Law Firm, Pensacola, FL, for Plaintiff.

Alan Harrison Brents, Akerman Senterfitt, Orlando, FL, for Defendant.

### *ORDER*

VINSON, District Judge.

Pending is the defendant's motion for summary judgment. (Doc. 15).

The plaintiff, Wendy L. Hallford, brought an action in this court pursuant to Title 29, United States Code, Section 1132, for violation of the Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. 1001 et seq.] based on a denial of disability benefits by the defendant, the Metropolitan Life Insurance Company. The defendant now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Unless otherwise noted, the following facts appear to be undisputed.

## I. FACTUAL BACKGROUND

This case involves a claim for long-term disability ("LTD") benefits under the AT & T Corporation ("AT & T")'s Long Term Disability Plan for Occupational Employees ("the Plan"), an employee welfare benefits plan sponsored by AT & T and governed by ERISA. The defendant, Metropolitan Life Insurance Company ("MetLife"), is the administrator for the Plan and decides claims and appeals for benefits under the Plan. The Plan is self-funded by AT & T.

To receive LTD benefits under the Plan, an employee must apply for benefits after exhausting the 52 weeks of paid sickness disability benefits provided by AT & T's Sickness and Accident Disability Benefits Program ("SADBP"), and must be totally disabled under the terms of the Plan. Total disability under the Plan is defined as being unable to do any job for any employer for which the employee is either qualified or may become reasonably qualified by training, education, or experience. Jobs paying less than 50% of the employees Eligible Base Pay at the time of the disability are not counted for this requirement. (Doc. 26, attach. 1, at 9). Once a person applies for LTD benefits, they are no longer considered an employee of AT & T, and if benefits are denied, they cannot return to their old job.

MetLife serves "as the final review committee under the Long Term Disability Plan", and has "sole and complete discretionary authority" to conclusively determine all the following:

* Administration of the Long Term Disability Plan and interpretation of all Long Term Disability Plan provisions;

* Determination of all questions relating to participation of eligible employees and eligibility for benefits;

* Determination of all relevant facts;

* Determination of the amount and type of benefits payable to any participant or beneficiary; and

* Construction of all terms of the Long Term Disability Plan.

(Doc. 26, attach. 1, at 14).

The plaintiff, Wendy L. Hallford ("Hallford"), was employed as a telephone operator for AT & T from November 1972 until July 2002. As an employee of AT & T, Hallford was enrolled in the Plan. In 1985, Hallford overextended her wrists while getting up from her waterbed. After receiving Cortisone injections, she eventually had carpal tunnel release surgery on her right hand.[1] After the surgery, Hallford's condition improved and she returned to work. The surgery was performed by Dr. Douglas Tappan. She reports that she experienced increased pain in 1994, and at Dr. Tappan's recommendation, her employer assigned her to activities that did not require keyboarding. Then, in 1998 Hallford sought medical attention for severe numbness in her hands. Hallford's physician, Dr. Tappan, conducted a needle electromyography and nerve conductive studies of Hallford's upper extremities. Both tests came back normal. Based on Hallford's symptoms and previous medical history, Dr. Tappan diagnosed her with carpal tunnel syndrome in her left and right hands. A second opinion from Dr. Robert Cameron confirmed this diagnosis and recommended carpal tunnel release surgery. In his evaluation, Dr. Carmeron also stated that Hallford "should not be returned post operatively to repetitive computer work." Administrative Record, at 7.

Hallford's second carpal tunnel release surgery was conducted on her right hand on January 12, 1999. The surgery re-

vealed no excessive pressure on the nerve, but did reveal some scarring around the nerve area. As part of her post operative care, Hallford was sent to Mary Ball for occupational therapy. Ball's initial evaluation noted that Hallford had a loss of function and sensation in her right hand, with a functional capacity of 30%. By March of 1999 this had risen to a functional capacity of 50%. Hallford continued to complain of numbness and pain, however, and by April, Dr. Tappan indicated that she had reached a level of maximum medical improvement.

According to medical records, in July of 2002 one of Hallford's fingers turned blue and became excessively sensitive to the touch. This was apparently due to a blood clot in her hand, which impeded circulation. Upon seeking medical attention, Hallford was sent to the emergency room, and underwent an emergency subclavian percutaneous transluminal angioplasty performed by Dr. John A. Tucker. In his post operative notes, Dr. Tucker indicated that Hallford "is not going to lose any tissue on the finger, and this is an outstanding result." Administrative Record, at 180.

Hallford stopped work on July 28, 1999. She initially received a year of "accident" disability benefits under SADBP,[2] followed by two years of worker's compensation benefits. On May 23, 2001, she was given an independent medical examination ("IME") by Dr. Michael Rappa, who concluded that Hallford's injuries were not work related. Shortly thereafter, she was reclassified and received 52 weeks of "sickness" benefits under SADBP. On June 5,

---

1. This procedure involves cutting the ligament over the carpal tunnel to relieve pressure on the nerve.

2. Hallford's disability was originally classified as "accidental" due to the belief that it was work-related.

2002, Hallford completed an application for LTD benefits under the Plan. Hallford listed "carpel tunnel syndrom" as the cause of her disability, and said that she was "unable to use hands" because doing so was "painful." Administrative Record, at 68.

In support of her application for LTD benefits, Hallford submitted an attending physician statement ("APS"), a standard form prepared by her treating physician, Dr. Douglas Tappan. Administrative Record, at 81–84. In the APS, Dr. Tappan indicated that Hallford suffered from carpal tunnel syndrome resulting from a work-related injury. Dr. Tappan restricted Hallford from climbing, engaging in repetitive fine finger movements or pushing and pulling with either hand. Dr. Tappan also indicated that Hallford was able to sit, stand, or walk over the course of a normal eight hour work day, that she could lift up to 10 pounds occasionally, reach above shoulder level, twist, bend, stoop, and engage in repetitive eye hand movements. Dr. Tappan did not complete the prognosis section of the APS form, and thus did not indicate his opinion whether Hallford could work in her own or another occupation. When asked why Hallford was unable to perform her job duties, Dr. Tappan wrote "Depends on job." Administrative Record, at 81.

Dr. Tappan's APS also made reference to a functional capacity evaluation ("FCE"), performed on May 19, 1999. The FCE concluded that Hallford could not perform her job as an operator for AT & T. The FCE also showed that Hallford could remain seated for the duration of a normal eight hour work day, that she could stand without restrictions, walk without restrictions, perform moderate stooping, lift 20 pounds knuckle to shoulder, 20 pounds floor to knuckle, and 10 pounds floor to shoulder, and reach overhead on occasion. Administrative Record, at 25–29.

As part of its determination process, MetLife forwarded Hallford's LTD application and medical records to several specialists for evaluation. First, MetLife sent Hallford's file to one of its nurse consultants, who concluded that Hallford was not totally disabled. Administrative Record, at 298. This decision, it seems, was based largely on Dr. Tappan's APS. Next, MetLife sent Hallford's file to one of its vocational rehabilitation consultants, who performed a transferable skills analysis ("TSA"). This TSA identified three occupations Hallford could perform given her training, education, experience, and disability. These occupations were (a) Information Clerk; (b) Systems Surveillance Monitor; and (c) Receptionist. Each of these occupations were found to exist in the geographic area near Hallford's home. Administrative Record, at 129–30. Based on these determinations, MetLife denied Hallford's LTD benefits application on August 14, 2002. Administrative Record, at 131–33.

On February 6, 2003, Hallford appealed MetLife's decision. Hallford included in her appeal additional information regarding her medical condition. This information, much of which pre-dated her June 2002 LTD benefits application, included a Provider's Report of Disability Absence for Non-Work Related Illness or Injury, dated September 25, 2001, and completed by Dr. Tappan. Administrative Record, at 144–45. This report indicated that Hallford was unable to perform her job duties as a telephone operator because of carpal tunnel syndrome. According to the report, Hallford was unable to climb, engage in repetitive fine finger movements, en-

gage in repetitive eye hand movements, or engage in pushing and pulling with either hand. Hallford was able to sit, stand, or walk over the course of a normal eight hour work day, that she could lift up to 10 pounds occasionally, reach above should level, twist, bend, or stoop.

Hallford also submitted the results of the IME given by Dr. Rappa on May 23, 2001. In this IME, Dr. Rappa disagreed with Dr. Tappan's diagnosis of carpal tunnel syndrome, saying "the symptoms in the hands are not totally consistent with carpal tunnel syndrome, and there is no objective diagnostic evidence to support this diagnosis." Administrative Record, at 168. Dr. Rappa based this conclusion on at least three factors: (1) that there was no radiographic data in support of the diagnosis; (2) that Hallford's condition did not improve after the carpal tunnel release surgery; and (3) that it would be unusual for a person to have carpal tunnel syndrome in both extremities. Administrative Record, at 168. The IME also noted that Hallford demonstrated a full range of motion in her upper extremities when distracted, and suggested that a psychological condition, such as a fictitious disorder,[3] might be responsible for Hallford's hand pain. Administrative Record, at 168. However, Dr. Rappa also noted that if psychological tests proved negative, he would be inclined to accept carpal tunnel as "default" diagnosis and advised that in such circumstances Hallford should undergo a fresh FCE. Administrative Record, at 171.

Hallford also submitted several documents that post-date her original June 2002 appeal. These included notes relating to her July 2002 angioplasty performed by Dr. Tucker, as well as a Medical Records Review ("MRR"), preformed by Dr. W. Ian Rogers on January 22, 2003. In the MRR, Dr. Rogers stated that "[o]bjectively, there are clinical signs that point towards carpal tunnel syndrome, however, there is no wasting and certainly no evidence of sensory denervation." A.R. 173. Dr. Rogers also indicated agreement with Dr. Rappa's view that Hallford should undergo psychological testing.

MetLife provided Hallford's file to Dr. Michael J. Chrnell for an independent medical opinion on the claim. After reviewing the file, Dr. Chrnell produced a report that took issue with Dr. Tappan's restrictions on Hallford's climbing and lifting, stating "there are no justifications provided for limiting Ms. Hallford's lifting to only 10 pounds occasionally [and] no objective documentation of a reason why she cannot climb." Administrative Record, at 254. Dr. Chrnell's report also noted the lack of objective evidence supporting a diagnosis of carpal tunnel syndrome, as well as the fact that Hallford had a full range of motion when distracted. Ultimately, Dr. Chrnell concluded that "Hallford is fully capable of sedentary and light duties, and that the medical documentation does not support functional limitation and Ms. Hallford's inability to function as of 07/11/02." Administrative Record, at 255. Dr. Chrnell concluded that whatever disability Hallford actually had stemmed largely from the two carpal release surgeries, rather than from an underlying condition. He indicated that Hallford could sit,

---

**3.** A fictitious disorder involves more than simply faking an illness. As described by Dr. Szmurlo, a fictitious disorder involves "a psychological need... to maintain a sick role, to be in a hospital, to be taken care of, at the cost of anything... patients with [fictitious] disorder would very willingly, happily, and gladly undergo major mutilating surgery if that served the purpose of remaining a patient." Administrative Record, at 221.

stand, or walk during an eight hour work day, that she could lift a maximum of 20 pounds and could lift up to 10 pounds frequently, and that she could frequently engage in handling/grasping, fingering, feeling, and pushing and pulling with her right hand.

On April 7, 2003, Hallford submitted additional evidence to MetLife. This included an IME performed by Dr. Peter A. Szmurlo on March 14 & 19, 2003, and the transcript of a deposition of Dr. Szmurlo taken on March 26, 2003. Dr. Szmurlo is a psychiatrist and the IME dealt primarily with psychological issues relating to Hallford's Workmen's Compensation disability claim. Dr. Szmurlo reviewed Hallford's prior medical records, and then conducted a wide range of psychological tests on Hallford.[4] Based on the results of these tests, Dr. Szmurlo concluded that Hallford's condition was not chiefly due to psychological factors, but that the circumstances surrounding her carpal tunnel syndrome had led to a poorly controlled depression which heightened her disability. As Dr. Szmurlo noted, Hallford's "depression further decreases her ability to function from a psychiatric standpoint and would interfere to a significant degree with her ability to return to gainful employment should suitable employment be found within her physical limitations." Administrative Record, at 211–12.

On April 14, 2003, MetLife upheld the denial of LTD benefits to Hallford. In its denial letter, MetLife cited Dr. Tappan's APS, the TSA, and the medical notes of Dr. Tucker as indicating that Hallford was not totally disabled. The letter also relied on Dr. Chrnell's report in its conclusions. The letter dismissed the additional evidence submitted by Hallford on April 7 as being irrelevant to the matter, stating: "Additional medical information was also received on April 7, 2003. Please note that the time frame in which you are eligible for long term disability benefits is July 11, 2002. It is during this time frame that our review is concentrating on." Administrative Record, at 285. Hallford has since brought a claim under Title 28, United States Code, Section 1332 seeking disability benefits under the Plan.

## II. DISCUSSION

### A. *Summary Judgment Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that par-

4. Specifically, the tests conducted were: General Health Questionnaire; Beck Depression Inventory II; Beck Anxiety Inventory; Irrational Values Scale; Beliefs in Personal Control Scale: Multi Dimensional Questionnaire: Pain and Distress Scale; Life Impact Assessment Scale; Dallas Pain Questionnaire; Owestry Pain Disability Questionnaire; Pain Related Distress Scale; Visual Analog Pain Scales; Mensana Clinic Pain Validity Scale; Bedside Screening for Organic Dysfunction; Hamilton Depression Inventory; Health Status Questionnaire; Multidimensional Pain Inventory; Symptom Checklist 90 Revised; Derogatis Psychiatric Rating Scale; Coping Strategies Questionnaire; Pain Beliefs Scale; Pain Coping Inventory; Symptom Survey 77; Victoria Symptom Validity Test; Paulus Deception Scales; and the MMPI–II.

ty's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *see also Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir.1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir.2000); *Ramsey v. Leath,* 706 F.2d 1166, 1170 (11th Cir.1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1313 (11th Cir.1999).

**B. ERISA**

■ Under Title 29, United States Code, Section 1132(a)(1)(B), a participant or beneficiary of an employee benefit plan may initiate civil proceedings to recover benefits due under the terms of the plan.

In an ERISA benefits case, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, and reviews the plan administrator's determination in light of the record as compiled before the plan fiduciary. *Leahy v. Raytheon,* 315 F.3d 11 (1st Cir. 2002); *Perry v. Simplicity Eng'g,* 900 F.2d 963 (6th Cir.1990). ERISA claims are not triable before a jury. *Blake v. Unionmutual Stock Life Ins. Co. Of America,* 906 F.2d 1525 (11th Cir.1990). A court in a nonjury case is entitled to draw inferences and conclusions from undisputed evidentiary facts if a bench trial would not enhance its ability to draw those inferences and conclusions. *Coats & Clark v. Gay,* 755 F.2d 1506 (11th Cir.1985); *Nunez v. Superior Oil,* 572 F.2d 1119 (5th Cir.1978).

■ ERISA does not provide the standard of review for decisions of a plan administrator. *Marecek v. BellSouth Telecomms., Inc.,* 49 F.3d 702 (11th Cir.1995). However, in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court laid out three different standards that are to govern review of Section 1132 claims: (1) *de novo* review where the plan does not grant the administrator discretion; (2) arbitrary and capricious review where the plan grants the administrator discretion and the plan administrator is not operating under a conflict of interest; and (3) heightened arbitrary and capricious review where there is a conflict of interest. *Id.; see also HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982 (11th Cir.2001). Plaintiff does not dispute that the Plan gives discretion to MetLife to construe Plan terms and determine eligibility. And, since the Plan is self-funded by AT & T and not by MetLife, there is no conflict of interest.

See Cagle v. Bruner, 112 F.3d 1510, 1516 (11th Cir.1997) ("Conflicts arise when a fiduciary or administrator pays benefits to participants and beneficiaries from its own assets"). Thus, the arbitrary and capricious standard applies.

██ "Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" HCA, supra, 240 F.3d at 993. If a court concludes that the administrator's decision was wrong under de novo review, it must then ask whether the decision was nevertheless reasonable. Williams v. BellSouth Telecommunications, 373 F.3d 1132 (11th Cir.2004). A wrong, but reasonable, decision will not be overturned on arbitrary and capricious review, even if there is evidence that would support a contrary decision. Jett v. Blue Cross & Blue Shield of Alabama, 890 F.2d 1137 (11th Cir.1989). It is only where the plan administrator's decision has no reasonable basis that it will be overturned by the district court. Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321 (11th Cir.2001).

██ It is plain that MetLife's decision to deny Hallford's LTD benefits application was based on substantial evidence. Even those portions of the record which are most supportive of Hallford's claim, such as Dr. Tappan's APS, do not show that Hallford was totally disabled. According to the APS, Hallford could sit, stand, or walk over the course of a normal eight-hour work day, that she could lift up to 10 pounds occasionally, reach above should level, twist, bend, stoop, and engage in repetitive eye hand movements. When asked why Hallford was unable to perform her job duties, Dr. Tappan gave the non-commital answer "Depends on job", and failed to complete the prognosis section of the APS form, and thus did not indicate his opinion whether Hallford could work in her own or another occupation. Administrative Record, at 81. Even accepting these restrictions, the TSA performed by MetLife's vocational rehabilitation consultant identified several occupations Hallford could perform, each of which was available in the geographic area near Hallford's home. Administrative Record, at 129–30.

There is also significant evidence in the record tending to show that Hallford's hands' condition was less disabling than Dr. Tappan's APS indicated. Dr. Rappa's IME of Hallford stated that there was no "objective diagnostic evidence" supporting a diagnosis of carpal tunnel syndrome, and that "the symptoms in [Hallford's] hands [were] not totally consistent with carpal tunnel syndrome." Administrative Record, at 168. Specifically, Dr. Rappa noted that it was quite rare for a person to have carpal tunnel syndrome in both hands as Hallford claimed, and that there was no radiographic data supporting the diagnosis. Dr. Rappa also noted that Hallford's condition did not improve after the carpal tunnel release surgery, which would be unusual if she had carpal tunnel syndrome. Most tellingly, Dr. Rappa observed IME that Hallford demonstrated a full range of motion in her upper extremities when distracted, indicating that her condition may have been overstated or psychological in origin.

These conclusions were supported by Dr. Rogers, who stated that " there [was] no wasting and certainly no evidence of sensory denervation" in Hallford's arms. Administrative Record, at 173. They were also supported by Dr. Chrnell, who

wrote that there was no objective evidence supporting a diagnosis of carpal tunnel syndrome, and "no justifications [in Dr. Tappan's APS] for limiting Ms. Hallford's lifting to only 10 pounds occasionally or no objective documentation of a reason why she cannot climb." Administrative Record, at 254. Given this evidence, MetLife's decision that Hallford was not totally disabled was completely appropriate.

MetLife did decline to consider Dr. Szmurlo's report and deposition transcript, which were submitted a week before it rendered its decision. Dr. Szmurlo's report, which indicated that she did have some psychological problems, was relevant to Hallford's claim insofar as it served to prove that the diagnosis of carpal tunnel syndrome may be erroneous and that her disability was not based on fraud. However, while the report is relevant to Hallford's claim, it is not highly probative. At best, it serves to explain the absence of objective diagnostic evidence. MetLife properly noted that the plaintiff's claim was limited to the period which ended on July 11, 2002, and the claimed disabling conditions existing prior to that time. The report does not show that Hallford was totally disabled under the terms of the Plan, and certainly does not overcome the great weight of evidence in the record indicating that Hallford was not totally disabled on or before July 11, 2002.

In her memorandum opposing summary judgment, Hallford cites *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276 (10th Cir.2002), and *Henderson v. Ameritech Corp.*, 2001 WL 1823813 (6th Cir. 2001), for the proposition that MetLife's failure to consider Dr. Szmurlo's report renders its decision arbitrary and capricious. *Henderson* is an unpublished case of little precedential value, and *Caldwell*

involved heightened arbitrary and capricious, rather than simple arbitrary and capricious review. *Caldwell, supra*, 287 F.3d at 1283. Neither case involved facts that are comparable to the circumstances here. Thus, *Henderson* and *Caldwell* are inapplicable to the facts of this case.

Under the applicable standard of review, I cannot say that MetLife's decision is wrong. Even if it were wrong, however, it certainly is reasonable under the facts and circumstances established in the record.

## III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (Doc. 15) is GRANTED. The Clerk shall enter judgment accordingly.