Jacqueline ADDIS

v.

**THE LIMITED LONG–TERM
DISABILITY PROGRAM.**

No. Civ.A. 05–357.

United States District Court,
E.D. Pennsylvania.

March 30, 2006.

Bonnie S. Stein, Curtin and Heefner L.L.P., Morrisville, PA, for Jacqueline Addis.

David Campbell, Michael Settineri, Cleveland, OH, for The Limited Long–term Disability Program.

### *MEMORANDUM AND ORDER*

SAVAGE, District Judge.

In this action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") to recover long term disability benefits, the plaintiff contends that the defendant's termination of her benefits was unreasonable, arbitrary and capricious because her multiple sclerosis prevents her from performing her job. Admitting that Addis has had multiple sclerosis since 1998, The Limited Long–Term Disability Program ("Limited")

maintains that the decision to deny her benefits was appropriate because her condition did not prevent her from doing her job on a continuous basis, rendering her ineligible for long term disability benefits.

Both parties have moved for summary judgment. After a thorough examination of the administrative record and after oral argument, I conclude that the plan administrator's decision was arbitrary and capricious. Applying a moderately heightened standard of review because the administrative process was affected by procedural bias, I find that the denial of Addis's disability claim was not supported by substantial evidence. Therefore, I shall grant the plaintiff's motion for summary judgment and deny the defendant's motion.

### Background

Jacqueline Addis ("Addis"), a thirty-five year old woman, had been employed at Victoria's Secret [1] as a store manager from April 1997 until June 2, 2003. As part of her employment benefits, she was covered under a group long term disability plan, which qualified as an "employee welfare benefits plan" under 29 U.S.C. § 1102.[2] Limited self-insures the plan and contracted with MetLife ("MetLife") to administer it.

In 1998, Addis began exhibiting symptoms of multiple sclerosis ("MS") and two years later was diagnosed with the disease. Despite cognitive and physical difficulties, she continued to work full time until January 5, 2003, when she applied for long term disability benefits. She submitted her application and her physician's notes to Cyndi Porter, the Human Resources Case Manager at MetLife,[3] which demonstrated that Addis's treating neurologist, Dr. Gabriel Tatarian ("Tatarian"), had determined that Addis could not perform the duties of her job due to her MS symptoms.[4] Responding to a question on the Plan's Medical Disability and/or Worker's Compensation Claim Statement, Dr. Tatarian wrote that his patient could not return to work, "until symptoms resolve. Arbitrarily indicated 3/6/03." [5] Addis was granted benefits retroactive to January 5, 2003, and received a weekly benefit of $476.39.

On March 21, 2003, after reviewing Dr. Tatarian's medical records, Tosha Ford, a MetLife case manager, denied Addis's claim as of March 5, 2003,[6] stating that she had relied on the advice of an unidentified "Independent Physician Consultant." Ford concluded that the medical information did not support a finding that Addis's condition prevented her from performing her job.[7] Addis appealed the denial of benefits on April 23, 2003.[8] Acquiescing to MetLife's determination, Addis returned to "light duty," working twenty hours a week.[9] At her doctor's instructions, Addis finally stopped working on June 2, 2003.[10]

On September 25, 2003, James Ludlow, a MetLife disability resource specialist, reiterated Ford's conclusion that Addis's condition did not prevent her from working.[11] The reasons given were that no additional clinical information had been

1. Victoria's Secret is owned by The Limited Brands.

2. *Def. Mot. Summ. J.* at 2.

3. *MetLife Administrative Record (MLAR) 000002–000003.*

4. *MLAR 000003.*

5. *MLAR 000003.*

6. *MLAR 000015–000016.*

7. *MLAR 000016.*

8. *MLAR 000026.*

9. *MLAR 000013–000014.*

10. *MLAR 000028–000031.*

11. *MLAR 000035–000036.*

submitted and Dr. Tatarian's file did not indicate that Addis's condition had deteriorated since the original denial of benefits.[12]

Addis retained counsel who, on November 25, 2003, supplemented the administrative record with Dr. Tatarian's narrative of Addis's medical history and medical records related to her multiple sclerosis.[13] On December 5 and 10, 2003, Addis's counsel supplied additional hospital reports documenting a multiple sclerosis exacerbation in November 2003.[14]

On April 9, 2004, through new counsel, Addis requested reconsideration of the September 25, 2003 denial of benefits.[15] On May 20, 2004, her new attorney was advised by Tammi Phillips, another MetLife disability resource specialist, that MetLife would be "willing" to conduct another review.[16]

On September 22, 2004, a year and a half after MetLife initially denied the claim, MetLife determined that Addis remained functional and her condition did not prevent her from working.[17] Summarizing the bases for its determination, MetLife stated that Addis's physician did not provide specific restrictions and limitations that rendered her unable to perform her job, and the medical evidence did not support the conclusion that she was totally disabled and unable to perform her job as store manager.[18] The denial letter also noted that an "Independent Physician Consultant" had concluded from a review of her file that her physical examinations were "unremarkable or demonstrated in-creased tone in the lower extremities," and that she could do her job.[19]

Addis then instituted this action. The parties have agreed that disposition of the cross-motions for summary judgment will decide the case in lieu of trial.

### The Limited Plan

For total disability purposes, Limited's Plan ("Plan") defines eligibility according to the duration of the claimant's disability and the extent of the claimant's limitations on her ability to work. During the first year of an illness, a claimant is considered totally disabled if she is under a doctor's regular care and is "unable to perform all duties" of her regular occupation.[20] After one year, the definition of disability changes in favor of the Plan, making it more difficult for the claimant to qualify for benefits. The test is no longer focused on the claimant's ability to perform the duties of her own occupation. It is whether she is able to perform the duties of "any gainful occupation for which [she is] reasonably qualified by education, experience or training." [21]

MetLife determined that Addis did not qualify for disability. It concluded that she was able to perform the duties of her own occupation as a store manager. Addis, on the other hand, contends that her MS condition prevents her from meeting the cognitive and physical demands of not only her position at Victoria's Secret, but of any occupation for which she may be qualified.[22]

12. *Id.*

13. *MLAR 000055–000131.*

14. *MLAR 000133–000175.*

15. *MLAR 000180–000182.*

16. *MLAR 000228.*

17. *MLAR 000404–000406.*

18. *MLAR 000406.*

19. *MLAR 000405.*

20. *MLAR 000522.*

21. *Id.*

22. *Tr. Oral Arg. Feb 23, 2006,* at 46.

## ERISA Standard of Review

The denial of benefits under an ERISA qualified plan must be reviewed using a deferential standard. Where the plan administrator has discretion to interpret the plan and to decide whether benefits are payable, the fiduciary's exercise of discretion is judged by an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). A court is not free to substitute its judgment for that of the administrator. *Abnathya v. Hoffmann–LaRoche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993). Accordingly, deferring to the plan administrator, a court will not reverse the administrator's decision unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 45.

Where the evidence raises a question of the plan administrator's impartiality or there is an inherent conflict of interest, a heightened standard of review is demanded. *Pinto v. Reliance Std. Life Ins. Co.,* 214 F.3d 377 (3d Cir.2000); *see also Goldstein v. Johnson & Johnson,* 251 F.3d 433, 442 (3d Cir.2001). A reviewing court must focus its heightened review in light of "the nature and degree of apparent conflicts" between the insurer and the employer. The greater the conflict, the less deference that is given. *Pinto,* 214 F.3d at 393.

Where there is an inherent conflict requiring a heightened standard of review, a court must use a sliding-scale approach, giving less deference to the administrator's decision as the level of the conflict rises. *Id.* at 391–92. Courts consider several factors to determine on a case-by-case basis whether the application of a heightened standard is appropriate based on an inherent conflict of interest, including "the sophistication of the parties, the information accessible to the parties, the exact financial arrangement between the insurer and

the company ... and the current status of the fiduciary." *Id.* at 392.

A financial conflict of interest arises when the same entity funds, interprets, and administers a disability plan because "the nature of the relationship between the funds, the decision, and the beneficiary invites self-dealing and therefore requires closer scrutiny." *Pinto,* 214 F.3d at 383–84. The Third Circuit treats these arrangements as creating an inherent conflict of interest, requiring greater scrutiny. *Id.* at 387, 390.

Where the employer administers the plan and an insurance company pays claims, there still may be a conflict. If the premiums paid by the employer are affected by the claims history, there is an incentive for the employer to keep claims to a minimum. On the other hand, if the premiums are fixed regardless of the number and the amount of the claims paid, there is no financial conflict.

Even absent an inherent financial conflict, procedural bias in the review process also mandates a closer look at the decision-making, utilizing a moderately heightened standard of review. *Kosiba v. Merck & Co.,* 384 F.3d 58, 67–68 (3d Cir.2004). In situations where a financial conflict of interest is compounded by evidence of procedural bias, a "significantly heightened" standard applies. *Id.* at 68.

Procedural anomalies may appear in a variety of ways. Examples of procedural bias that invite a higher standard of review include: failing to follow a plan's notification provisions and conducting self-serving paper reviews of medical files, *Lemaire v. Hartford Life & Acc. Ins. Co.,* No. 02–2533, 2003 WL 21500334, at *4 (3d Cir. June 30, 2003); relying on favorable parts while discarding unfavorable parts in a medical report, *Pinto,* 214 F.3d at 393–94; denying benefits based on inadequate information and lax investigatory proce-

dures, *Friess v. Reliance Std. Life Ins. Co.*, 122 F.Supp.2d 566, 574–75 (E.D.Pa. 2000); and ignoring the recommendations of an insurance company's own employees that benefits be reinstated, *Pinto*, 214 F.3d at 394.

Addis argues that throughout the process, she was misled regarding MetLife's role. She believed that MetLife both funded and administered the plan. Even at the outset of the litigation it appeared to her to be the case. Neither MetLife nor Limited clearly defined their respective roles in the decisionmaking process. Indeed, Phillips advised Addis's counsel that the plan administrator was Limited Brands, Inc.[23] In reality, the plan was and is administered by MetLife and funded by The Limited.[24] Thus, despite any impression Addis had to the contrary, there is no apparent financial conflict.

The absence of a financial conflict does not end the inquiry into the appropriate standard of review. Procedural anomalies in MetLife's treatment of the evidence may warrant a moderately heightened scrutiny. Hence, I shall examine what evidence MetLife had available and how it treated that evidence.

### Evidence Available to MetLife

When it considered Addis's claim, MetLife had the medical records and reports from her treating neurologist, office notes from several other physicians who treated her, MRI results, an emergency room report and the physician consultant's review prepared at MetLife's request.[25]

The documentation revealed that Addis's condition deteriorated over time and adversely affected her ability to work. According to Dr. Tatarian's treatment summary, Addis first sought neurological care in October 1998, complaining of headaches, intermittent visual symptoms, persistent fever and chronic fatigue.[26] An MRI in 2000 revealed an increase in the number of brain lesions, leading Dr. Tatarian to diagnose Addis with MS.[27] A December 2003 MRI, which is referenced in Dr. Tatarian's January 23, 2004 letter, revealed there was new enhancing plaque in the right cerebellum and a streak through both hemispheres of the cerebellum.[28]

After Addis left her job, her condition worsened. In November 2003, Dr. Tatarian wrote, "intermittent right visual loss, left leg and arm clumsiness. She gets confused at times and describes muscle spasms in her legs, fluttering in her chest and at times has had choking sensations in her stomach." [29] Addis had tingling in her legs and crawling on her shins, legs and arms.[30] She suffered from headaches, was unsteady on her feet, and had ringing in her ears.[31]

Dr. Tatarian examined Addis routinely every three months and sometimes more frequently.[32] He commented that his patient had numerous exacerbations, including one that caused a fall down a flight of steps in October 2003.[33] According to Dr. Tatarian, she was finally forced to stop working.[34]

**23.** *MLAR 000228.*

**24.** *MLAR 000603.*

**25.** *MLAR 000404–000405.*

**26.** *MLAR 000244.*

**27.** *Id.*

**28.** *MLAR 000243.*

**29.** *MLAR 000244.*

**30.** *Id.*

**31.** *Id.*

**32.** *MLAR 000245.*

**33.** *Id.*

**34.** *Id.*

Dr. Tatarian diagnosed relapsing remitting MS with typical manifestations of cerebral and spinal cord symptoms and a tendency toward exacerbations.[35] He reported that his patient had worked diligently during her treatment, but he recommended that she stop working due to the unpredictable periods of weakness, fatigue, sphincter incontinence, visual difficulties and cognitive problems.[36] He specifically emphasized his patient's fatigue, pointing out that it often limits how long she can sit, stand and concentrate on cognitive tasks.[37] He opined that although medication could reduce the likelihood of relapses by about 30%, her condition would likely deteriorate over time, requiring regular medical examinations, medicines and diagnostic studies.[38]

### Multiple Sclerosis [39]

Addis's physical condition and limitations must be evaluated in the context of the disease—multiple sclerosis. There is no indication anyone familiar with the disease and its consequences reviewed the file. *Compare Patton v. Continental Cas. Co.*, No. Civ.A. 04–0220, 2005 WL 736595, at *5 (E.D.Pa. Mar.31, 2005).

Multiple sclerosis is a chronic degenerative disease which affects the central nervous system, including the brain and the spinal cord. The disease is marked by an immune-system attack on the myelin, the protective insulation surrounding the nerves. Inflammation causes the myelin to degenerate, eventually disappear, and be replaced by sclerotic tissue. The hardened tissue retards the flow of electrical impulses that travel along the nerves, eventually causing progressive interference with vision, speech, walking, writing and memory.

The disease is unpredictable and varies greatly from person to person. Symptoms appear intermittently in some people and are permanent in others. Consequently, some people are asymptomatic when in remission and symptomatic when the disease is active.

Diagnosis is difficult because in the early stages, symptoms can indicate any number of disorders. Exacerbations, periods when symptoms are active, are sometimes followed by remissions, periods of calm. A diagnosis can not be confirmed until signs of the disease appear in different parts of the nervous system and there are at least two exacerbations. Approximately 85% of MS patients suffer from "relapsing-remitting" MS, which is characterized by defined exacerbations of acute worsening neurotic functioning.

### MetLife's Treatment of the Evidence

 MetLife assigned reconsideration of Addis's claim to Tammi Phillips, who was not a physician and whose qualifications are unknown. Disagreeing with Dr. Tatarian's diagnosis,[40] Phillips noted that an MRI of Addis's spine on January 4, 2003 showed no evidence of MS.[41] She remained unpersuaded by an October 25, 2003 MRI, which showed regression of the number of "plaques." [42]

Mischaracterizing Dr. Tatarian's January 6, 2003 letter to Addis's family doctor,

---

**35.** *MLAR 000247.*

**36.** *Id.*

**37.** *Id.*

**38.** *Id.*

**39.** The description of multiple sclerosis was gathered from the National Multiple Sclerosis Society. Just the Facts 2005–2006 (Nat'l MS Soc.2005).

**40.** Despite Phillips' reservations, both Dr. Greenhood and The Limited's counsel have conceded that Addis suffers from MS.

**41.** *MLAR 000405.*

**42.** *Id.*

Phillips emphasized that Dr. Tatarian's examination showed a normal mental status and neurological examination, implying that the increased tone in the lower extremities [43] was indicative of a normal examination or improvement in her condition.[44] Her assessment ignores Dr. Tatarian's unequivocal diagnosis that Addis was suffering from "relapsing, remitting MS with possible repeat exacerbation." [45] Contrary to the reviewer's implication, Dr. Tatarian stated that the increased tone in Addis's lower extremities suggested a spinal cord abnormality "that was not present before." [46] Thus, instead of supporting the absence of MS, the increased tone was a significant symptom of the disease.

Phillips minimized the significance of Dr. Tatarian's detailed letter of November 21, 2003, in which he had recommended that Addis stop working due to her unpredictable weakness and fatigue. Ignoring the rest of Dr. Tatarian's findings, Phillips, as a basis for finding Addis not disabled, seized upon a sentence in a follow-up letter in which the doctor states that Addis was doing "really well." [47] Phillips presented this statement as an assessment of Addis's condition vis-a-vis a healthy woman rather than in the context of her relapsing, remitting disease.

MetLife relied almost exclusively upon the report of Dr. Gary Greenhood, an internist specializing in infectious diseases [48] hired by MetLife, who did not examine Addis and did only a records review.[49] Dr. Greenhood selectively viewed Addis's medical records, and MetLife then selectively adopted parts of Dr. Greenhood's report to support denial of the claim.

### Analysis

In evaluating MetLife's decision to deny Addis disability benefits, I shall examine the reasons given for its denial and its application of the plan to the facts. In doing so, I shall carefully scrutinize the record for potential procedural anomalies.

MetLife determined that Addis was not disabled because she had no "specific limitations that would support [her] inability to perform her own job." [50] Although the denial letter listed reports of several physicians, it relied exclusively on Dr. Greenhood, the internist it had retained, and gave little consideration to Addis's treating neurologist, Dr. Tatarian. There is no discussion of the reports or findings of any of the other physicians who are listed. This treatment of the medical opinions raises a question of procedural bias.

MetLife deliberately chose to accept the opinions of its own physician, who was not a specialist, over those of the insured's treating physician, who was a specialist. Phillips relied exclusively on the report of Dr. Greenhood, an internist specializing in infectious disease. This unqualified reliance on its retained consultant ignored Addis's treating neurologist's opinions. The reviewer did not explain why she made this choice. Instead, she merely recited, without any analysis, portions of Dr. Greenhood's sparse report.

When the Supreme Court held, in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 829–30, 123 S.Ct. 1965, 155

---

43. Increased tone is caused by damage to the pathways between the brain and spinal cord. It is a positive finding for MS.

44. *MLAR 000405.*

45. *MLAR 000258.*

46. *MLAR 000258.*

47. *MLAR 000243.*

48. As indicated above, MS is not an infectious disease.

49. *MLAR 000409.*

50. *MLAR 000406.*

L.Ed.2d 1034 (2003), that the rule giving special deference to a treating physician's opinion in Social Security disability cases did not apply to ERISA disability cases, it did not grant plan administrators a license to disregard or only cursorily consider the opinions of the physicians who were familiar with and treated the claimant. The Court concluded that deference may not be warranted when a treating physician had only a short relationship with the patient, or when the plan's retained consultant is a specialist and the treating physician is a general practitioner. *Id.* at 832, 123 S.Ct. 1965. At the same time, it acknowledged that a treating physician in many cases has a better opportunity to know and observe the patient than do consultants retained by a plan. *Id.*

*Nord* did *not* state that treating physicians' opinions are never entitled to deference over retained consultants' opinions. Rather, *Nord* instructs that "courts have no warrant to require administrators *automatically* to accord special weight to the opinions of a claimant's physician," and that courts may not "impose on plan administrators a discrete burden of explanation when they credit *reliable* evidence that conflicts with a treating physician's evaluation." *Id.* at 834, 123 S.Ct. 1965 (emphasis added).

The Supreme Court's instruction does not authorize a plan to give conclusive weight to an unreliable report of a non-treating physician. Nor does it insulate plan decisionmakers every time they decide to overrule a treating physician's report in favor of a consultant's opinion. *Nord,* 538 U.S. at 834, 123 S.Ct. 1965 ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

In summary, if the consultant's conflicting opinion is based on reliable evidence, it can support a determination contrary to that of a treating physician, especially if the consultant is a specialist and the treating physician is not. In such a case, the plan need not explain why it chose the consultant's opinion over the treating physician's. Conversely, where the treating physician is a specialist who has treated his patient over time and the insurer's non-specialist consultant has not, the plan may be required to explain why it relied on its consultant's evaluation and disregarded or only superficially considered the treating physician's findings.

### Reliance on Non–Specialist

Dr. Greenhood is not a specialist in neurology or MS. He does not have the specialized working knowledge of the disease that Dr. Tatarian has. Consequently, Dr. Greenhood is less qualified than Dr. Tatarian to opine regarding the effects of Addis's disease on her functional abilities. Nevertheless, without sufficient explanation for doing so, Phillips completely relied on Dr. Greenhood's report.

### Selectivity

Dr. Greenhood selectively extracted portions of Dr. Tatarian's treatment notes to support his conclusions, which are contrary to those of Dr. Tatarian. At the same time, he ignores parts that bolster Addis's complaints and support her doctor's diagnosis and prognosis.

In his report, Dr. Greenhood states that Addis's physical examinations were "either unremarkable or demonstrated increased tone in the lower extremities."[51] Implying that these were normal findings, he ignored Dr. Tatarian's observation that the increased tone in the lower extremities was a spinal cord abnormality.[52]

---

**51.** *MLAR 000407.*

**52.** *MLAR 000258.*

Dr. Greenhood states that there were no objectively abnormal findings in the materials he reviewed, creating the impression that the absence of such findings rules out a disabling condition. He also ignores the MRI reports evidencing MS, November 2, 2000, and December 9, 2003, while citing two that show no evidence of the disease.[53] To the contrary, Dr. Tatarian documents a variety of spinal problems; and, MRIs consistently showed the presence of lesions and plaque on the brain. Dr. Greenhood ignores Dr. Tatarian's report of a positive Babinski sign, which is indicative of nerve damage consistent with Addis's complaints of stumbling and falling.

Significantly, there is no discussion of the records of Doctors Lavdas, McDonald, Gray, Files and McCarel, which he lists as having been submitted to him.[54] Dr. Greenhood simply ignores them.

### Dr. Greenhood's Vague Report

The Plan correctly argues that the issue is not whether Addis has MS, but whether she could perform her job. Although Phillips apparently questioned the diagnosis, the Plan now concedes that Addis suffers from the disease. Consequently, it directs the focus to Addis's ability to do her job.

The Plan cannot rely on Dr. Greenhood to support its decision that Addis could perform her regular occupation because he did not address the issue. Dr. Greenhood concluded that whatever limitations Addis had, they did not "preclude work."[55] Nowhere does Dr. Greenhood discuss Addis's ability to perform her job as store manager. Nor does he identify what kind of work she can perform. Whether inten-

tional or not, Dr. Greenhood did not opine that she had the ability to perform her job as a store manager. In fact, there is nothing in his report that indicates he knew and considered the physical and mental requirements of Addis's occupation. Yet, Phillips mischaracterizes Dr. Greenhood's conclusion when she remarks that he had determined that Addis no longer "continued to be disabled from performing [her] job as a Store Manager."[56] In short, Phillips' characterization of Dr. Greenhood's conclusion goes beyond what he had actually stated.

In his carefully crafted report, Dr. Greenhood stated that he "is unable to substantiate" the alleged limitations.[57] Importantly, he did not deny that Addis has the limitations, only that he cannot determine them from his limited review of the records.[58] Based on his review of the medical records and without having had the benefit of examining Addis, he can only opine that he is unable to confirm the limitations described by Dr. Tatarian, stopping short of definitively opining that she does not have the limitations.[59]

Dr. Greenhood is similarly evasive when addressing Addis's complaints of fatigue. He ignores Dr. Tatarian's conclusion that fatigue impacts Addis because "it is fairly consistent but at times worse than others and limits how long she can sit, stand or concentrate on cognitive tasks."[60] Instead, he states that it is "impossible" to quantify fatigue, but concedes that it can be an "integral" part of symptoms of MS patients.[61] Yet, he offers no opinion on

---

53. *MLAR 000407–000408.*

54. *MLAR 000407.*

55. *MLAR 000407.*

56. *MLAR 000405.*

57. *MLAR 000258.*

58. *MLAR 000407–000408.*

59. *Id.*

60. *MLAR 000247.*

61. *MLAR 000407–000408.*

how her fatigue particularly affects Addis. Thus, Dr. Greenhood overlooked how these functional limitations impacted Addis's ability to perform her regular occupation.

Consistent with the tenor of his report, Dr. Greenhood does not directly contradict Dr. Tatarian's conclusions, but merely questions them on the basis of his limited information. He advises that he is "unable to confirm" that there was an exacerbation of MS as reflected in Dr. Tatarian's treatment notes.[62] He does not state that she did not have the exacerbation, only that he does not see evidence of it in Dr. Tatarian's notes. Although he was unable to agree or disagree with Dr. Tatarian's conclusions, Dr. Greenhood chose his words in a manner favorable to MetLife.

Both MetLife and Dr. Greenhood ignored the Multiple Sclerosis Medical Source Statement of Functional Abilities and Limitations completed by Dr. Ana Lavdas, one of Addis's treating doctors.[63] Dr. Lavdas reported that her patient's prognosis was poor and she had significant functional limitations.[64] Among the symptoms were pain in the lower extremities, fatigue, weakness and shaking in lower and upper extremities, poor coordination, bladder and bowel problems, blurred vision, and other physical problems.[65] She noted that Addis had "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station."[66] Dr. Lavdas concluded that her patient was "unable to work," and could not sustain a job.[67]

Although Dr. Lavdas's statement had been submitted to MetLife for review in the appeal process, it was never addressed by the insurer or its hired consultant. Dr.

Lavdas was not a specialist in the treatment of MS. However, she did see Addis over a period of time, before and after she stopped working, and was personally familiar with her patient's limitations, whatever their cause. Even though MetLife may not have had a duty to explain why it chose Dr. Greenhood's conclusions over Dr. Lavdas's, the failure to mention or acknowledge Dr. Lavdas's findings displays a procedural bias. Similarly, Dr. Greenhood never discussed Dr. Lavdas's description of her patient's functional limitations and her opinion that Addis could not work.

There is no explanation why Dr. Greenhood, who had limited his opinions to the period from January to July of 2003, felt it unnecessary to evaluate Addis's ability to work after that period. One possible explanation is that the evaluation did not support a predetermination to deny benefits. Another is that he was instructed to do so. Nevertheless, regardless of the reason, failure to consider the post-July 2003 evidence in light of Addis's functional limitations and their potential impact on her ability to do her job is inexcusable.

Similarly, even though Dr. Greenhood had available and mentioned Dr. Tatarian's notes and Dr. Lavdas's records covering the period as late as January 23, 2004, he confined his opinions to Addis's ability to "work," in light of his perception of her functional limitations, as of July 2003. There is no discussion of how he believed her limitations affected her ability to work beyond July 2003. By cutting short the period under consideration, Dr. Greenhood was able to avoid confronting both Dr. Tatarian's unequivocal opinion as stated in

---

62. *MLAR 000408.*

63. *MLAR 000279–000284.*

64. *MLAR 000279.*

65. *MLAR 000279–000280.*

66. *MLAR 000280.*

67. *MLAR 000281–000282.*

his letter of November 21, 2003, and Dr. Lavdas's similar opinion in her statement of April 9, 2004, that their patient could not work. Indeed, Dr. Greenhood does not reference Dr. Tatarian's findings that Addis had had "various exacerbations" and had fallen in October 2003 as a result of one. These post-July 2003 reports directly conflict with Dr. Greenhood's statement that he was "unable to confirm" that there had been an exacerbation of multiple sclerosis during the interval in question.[68] Again, the conflict is unexplained.

*MetLife's Reconsideration Decision*

The lack of any indication that MetLife took steps to have the file reviewed by someone with an understanding of MS and its unpredictable symptoms is troubling. Phillips quotes large portions of Dr. Greenhood's report. For example, she notes that Dr. Greenhood found Addis's physical examinations "unremarkable or demonstrated increased tone in the lower extremities."[69] While Dr. Greenhood noted increased tone on two occasions, he did not explain the significance of the finding. Phillips apparently believed, incorrectly, that "increased tone" signified an improvement in Addis's condition. To the contrary, increased tone in MS patients is indicative of sustained stiffness and spasms in patients.[70]

Disturbing, in light of the clear evidence to the contrary, is Phillips's conclusion that Dr. Tatarian did not provide "any specific restrictions and limitations" that would prevent Addis from performing her own job.[71] On the contrary, Dr. Tatarian specifically recommended that due to her unpredictable weakness, fatigue, sphincter incontinence, visual difficulties, and cogni-

tive problems, Addis could no longer work.[72] There is nothing in the administrative record to reflect that MetLife considered whether Addis, with her symptoms, could manage payroll and inventory, and meet the physical demands of moving inventory and store fixtures, all duties recognized by Limited as part of Addis's job description.

Considering the administrative record and the procedural anomalies, I find that MetLife's decision to deny benefits was not supported by substantial evidence. Instead, it was arbitrary and capricious. Thus, using either a moderately heightened or the more deferential standard of review, I conclude that MetLife's denial of benefits was improper, unreasonable and inappropriate.

### Remedy

■ In an ERISA benefits case where it determines the plan acted inappropriately, a court has discretion in fashioning a remedy. *See, e.g., Carney v. Int'l Brotherhood of Electrical Workers Local Union 98 Pension Fund,* Nos. 02–2679, 02–3488, 66 Fed.Appx. 381, 385–87 (3d Cir. May 16, 2003). Upon finding that a plan administrator acted arbitrary and capriciously, a court may either remand the case to the administrator for a re-evaluation of the claim or retroactively award benefits. *Cook v. Liberty Life Assur. Co. of Boston,* 320 F.3d 11, 24 (1st Cir.2003). Remand is unnecessary where the claimant would have received benefits had the plan acted appropriately. *Id.*

This case does not present a question of a misinterpretation of the plan or the application of a wrong standard by MetLife.

---

68. *MLAR 000408.*

69. *MLAR 000405.*

70. http://www.ninds.nih.g ov/disorders/multiple_sclerosis/multiple_sclerosis.htm

71. *MLAR 000408.*

72. *MLAR 000247.*

It revolves around the inappropriate and arbitrary consideration and evaluation of evidence. Had MetLife given full and appropriate consideration to the evidence, Addis would have received benefits.

ERISA promotes the interests of employees and other plan beneficiaries by protecting employees' contractually defined benefits. *See McLeod v. Hartford Life & Acc. Ins. Co.*, 372 F.3d 618, 624 (3d Cir.2004) (citing *Firestone*, 489 U.S. at 113, 109 S.Ct. 948). Allowing a plan administrator another opportunity to re-enforce its conclusion after many months and several layers of administrative proceedings during which it had ample time to conduct the necessary evaluation would undermine these underlying policies of ERISA. *Carney*, 66 Fed.Appx. 381, 386–87 (citing *Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 648 (2d Cir.2002) and *Caldwell v. Life Ins. Co. of North Am.*, 287 F.3d 1276, 1288–89 (10th Cir.2002)).

When a plan or administrator has a contested claim under review, it knows that the claimant contends that she was and is disabled, and must anticipate that she contends the disability is continuing. The plan must undertake the review using the different eligibility standards when the disability test changes on a particular date during the administrative process. To do otherwise enables an insurer to benefit from an early termination of benefits while awaiting the outcome of litigation, forcing the claimant to start the administrative process anew in order to collect continuing benefits.

MetLife initially certified Addis as disabled on January 5, 2003, and the Plan paid her benefits until March 5, 2003. MetLife, after a review by a person other than the one who had approved benefits, then determined that she was not entitled to benefits because she was able to do her job as a store manager. During the time Addis's claim was under review, the test of disability changed. After January 5, 2004, one year after she had been originally deemed disabled, the standard shifted from the "own occupation" standard to the "any occupation" standard.

MetLife should have considered the plaintiff's eligibility for both "own occupation" benefits for the appropriate period and "any occupation" benefits thereafter. It chose not to do so, applying only the "own occupation" standard.

During the administrative process, more than 19 months transpired from the time MetLife originally declared Addis disabled and granted her benefits, and the time MetLife finally denied her claim, using the "own occupation" standard. In the meantime, MetLife received additional medical information updating her deteriorating condition and her functional limitations. The documentation generated by Addis's treating doctors covered the period beyond the first year of Addis's claimed disability. Nevertheless, MetLife's physician consultant, whether on his own or at MetLife's direction, determined Addis's limitations as of July 2003, six months into the disability period at issue. As observed earlier, this arbitrary cut-off date enabled the consultant and MetLife to ignore the medical evidence of Addis's condition and limitations beyond that date.

Remanding for further administrative proceedings at this time is not warranted. Medical knowledge of MS teaches that the disease is a progressive one with debilitating consequences for the afflicted. The medical evidence in this case proves the point. Addis's condition worsened and her limitations increased over the course of the review period itself. Thus, although the Plan may conduct further review of the plaintiff's continuing eligibility for benefits under the "any occupation" standard, past benefits under both tests of disability will be awarded to date.

622

## ORDER

AND NOW, this 30th day of March, 2006, upon consideration of the cross-motions for summary judgment (Document Nos. 5, 6), and after oral argument, it is **ORDERED** as follows:

1. The defendants' motion for summary judgment is **DENIED**;

2. The plaintiff's motion for summary judgment is **GRANTED**;

3. No later than April 15, 2006, the parties shall submit a proposed order awarding the plaintiff relief consistent with this Court's memorandum opinion accompanying this Order. If the parties cannot agree on a proposed order, they shall file separate proposed orders accompanied by explanations not to exceed three pages.

4. Judgment will be entered in favor of plaintiff Jacqueline Addis and against the defendant The Limited Long–Term Disability Program after the parties have complied with the preceding paragraph.