NANCY D. FREUDENTHAL, UNITED STATES DISTRICT JUDGE
This matter is before the Court on Plaintiff Bethany Calderon's Motion for Summary Judgment. The Court has considered the parties' briefs and oral arguments and is fully informed in the premises. The Court FINDS AND ORDERS as follows.
BACKGROUND
The instant suit stems from a 2016 motorcycle accident in Albuquerque, New Mexico. On August 31, 2016, Mr. Calderon was driving northbound on San Mateo Boulevard, approaching the intersection of San Mateo Lane. (Doc. 22-1 at 47).[1] At the *1263 same time, another driver, Timothy Wade, was traveling on San Mateo Lane. (Id. ). When Mr. Wade reached the intersection of San Mateo Lane and San Mateo Boulevard, he began making a left-hand turn onto San Mateo Boulevard. (Id. ). As Mr. Wade came to the intersection, he stopped at a stop sign and then proceeded to enter the intersection, believing it was clear. (Doc. 22-1 at 16). Unfortunately, this was not the case. Mr. Wade failed to yield the right of way to Mr. Calderon, causing a collision. (Id. ). Calderon died from the injuries he sustained during the crash. (Id. ).
As an employee of Sennheiser New Mexico, LLC, Calderon enjoyed an insurance plan governed by the Employee Retirement Income Security Act ("ERISA"), which included an accidental death and dismemberment provision. (Doc. 17-1 at 299). Hartford issued the plan, and Calderon's wife, Ms. Calderon, was a beneficiary under that plan. (Id. ) In September 2016, following her husband's death, Ms. Calderon submitted a claim for accidental death benefits under her husband's plan. (Id. at 299-302). On October 10, 2016, Hartford informed Ms. Calderon it had received her claim. (Id. at 22). Six months later, on April 5, 2017, Hartford denied coverage. (Id. at 17-20). In doing so, Hartford noted Mr. Calderon was intoxicated at the time of the collision. (Id. at 18-19). Indeed, Hartford cited a toxicology report that revealed Calderon had a blood-alcohol content of .2 percent at the time of the accident. (Id. at 18). Additionally, Hartford referenced a police report compiled after the crash. (Id. ). Citing a quotation from one of the responding officers in a supplementary offense report compiled several months after the crash, Hartford noted that "Mr. Calderon's level of intoxication likely would have affected his ability to reasonably respond and react to the vehicle pulling in front of him which may have reduced the severity of the collision." (Id. ).
Given Mr. Calderon's intoxication, Hartford concluded two policy provisions excluded coverage. (Id. at 17-18). First, Hartford noted the policy defined covered injuries as those "resulting directly from an accident" and "independently of all other causes." (Id. at 17). Second, Hartford cited to a provision that barred recovery for "any loss caused or contributed to by" an "injury sustained while intoxicated." (Id. at 18). According to Hartford, since Mr. Calderon was intoxicated, his injury did not occur "independently of all other causes." (Id. at 18-19). Likewise, Hartford determined the second provision also barred recovery, as his intoxication likely "caused or contributed to" his injury (Id. ).
At the time of denial, Hartford informed Ms. Calderon she had 60 days to submit any additional information she thought might be relevant to Hartford's consideration of her benefits claim. (Id. at 19). Hartford also indicated ERISA provides policy beneficiaries a right of appeal and a "full and fair review." (Id. ). If Ms. Calderon wanted to appeal, she also had to pursue this remedy within 60 days. (Id. ). Finally, Hartford informed Ms. Calderon that she could seek review in federal district court upon exhaustion of her administrative remedies. (Id. ).
On June 8, 2017, in response to Hartford's denial, Ms. Calderon sent the Hartford Claims Appeals Unit a document captioned "Appeal for Full and Fair Review of Decision to Deny Accidental Death and Disability Benefits." (Doc 22-1 at 1). Though Ms. Calderon captioned the document as an "appeal," Hartford seemed to view the document in a different manner. On June 14, 2017, Hartford informed Ms. Calderon it had received the materials she *1264 sent on June 8 and that it would treat those documents as a supplementation to Ms. Calderon's original claim for benefits. (Doc. 17-1 at 16). Hartford stated it would forward the document to its claims office for consideration and informed Ms. Calderon she would have a right to appeal if Hartford denied her claim again. (Id. at 15). On October 10, 2017, Hartford sent another denial letter, citing the same policy provisions it relied upon in its initial denial. (Id. at 13).
On April 9, 2018, Ms. Calderon filed suit in this Court under 29 U.S.C. § 1132(a).[2] (Doc. 1). This statutory section allows beneficiaries to bring civil actions to recover benefits, enforce rights under a plan, or to clarify rights and benefits under a plan. 29 U.S.C. § 1132(a) (2018). Later, Ms. Calderon moved for summary judgment. (Doc. 18). As part of her motion, she also requested attorney's fees and prejudgment interest. (Doc. 18).
At the beginning of her motion, Ms. Calderon asserts the Court should utilize a de novo standard of review because Hartford failed to comply with procedural deadlines set forth in the policy when responding to her claim for benefits. (Id. at 12-14). On the merits, Ms. Calderon contends summary judgment is proper because Hartford failed to point to evidence demonstrating any causal link between Mr. Calderon's crash and the collision. (Id. at 19-24). Accordingly, Ms. Calderon claims Hartford wrongfully denied coverage under the two provisions cited in its letter of denial.[3] (Id. ). Finally, Ms. Calderon argues she is entitled to attorney's fees and prejudgment interest under ERISA because the Court should deem her the prevailing party in this matter (Id. at 18).
As to the standard of review, Hartford advocates for a more deferential arbitrary and capricious standard, because the policy gave Hartford discretion to make benefits determinations. (Doc. 21 at 15-20). On the merits, Hartford claims it presented some evidence of causation. (Id. at 16). As Hartford notes, a responding police officer stated in a supplementary offense report that Calderon's "level of intoxication likely *1265 would have affected his ability to reasonably respond and react to the vehicle pulling in front of him which may have reduced the severity of the collision." (Id. ). Moreover, even in the absence of evidence demonstrating causation, Hartford contends denial of Ms. Calderon's claim would have still been proper based on the plain language of the policy. (Id. at 18-20). Hartford relies specifically on the provisions excluding coverage for "any loss caused or contributed to by ... [i]njury sustained while Intoxicated." (Id. at 17). Hartford suggests this provision does not require it to demonstrate causation, only intoxication. (Id. at 18-20). While Hartford does not address Ms. Calderon's argument for prejudgment interest in its response, it contends that an award of attorney's fees would be premature. (Id. at 21).
STANDARD OF REVIEW
Since the parties dispute the appropriate standard of review, the Court will begin with that issue. When courts review benefits denial claims under ERISA, they should use a de novo standard of review unless the plan vests an administrator with discretion to "determine eligibility for benefits." Chambers v. Family Health Plan Corp. , 100 F.3d 818, 825 (10th Cir. 1996). If a plan administrator has such authority, courts will instead consider whether a plan administrator's decision was arbitrary and capricious. Id. The arbitrary and capricious standard merely requires courts to consider "whether [the] interpretation [of the plan] was reasonable and made in good faith." Kellogg v. Metro. Life Ins. Co. , 549 F.3d 818, 826 (10th Cir. 2008). The standard does not require the insurance company's decision to be "the only logical one or even the superlative one." Adamson v. UNUM Life Ins. Co. of Am. , 455 F.3d 1209, 1212 (10th Cir. 2006).
Even if courts look to this more deferential standard, when a conflict of interest is present, they must consider that conflict as a factor in determining whether the denial was arbitrary and capricious. Scruggs v. ExxonMobil Pension Plan, 585 F.3d 1356, 1361 (10th Cir. 2009). Conflicts of interest exist where fiduciaries must decide whether to compensate beneficiaries while also protecting their own financial interests. Pitman v. Blue Cross & Blue Shield of Okla. , 217 F.3d 1291, 1296 n. 4 (10th Cir. 2000). In these situations, courts will simply "decrease the level of deference given ... in proportion to the seriousness of the conflict." Weber v. GE Group Life Assurance Co. , 541 F.3d 1002, 1010 (10th Cir. 2008).
While courts normally utilize an arbitrary and capricious standard in cases where an administrator has decision-making authority, this general rule will yield in some instances. Specifically, where courts find "procedural irregularities in [an] administrator's consideration of the benefits claim," de novo review is often appropriate. LaAsmar v. Phelps Dodge Corp. Life, 605 F.3d 789, 797 (10th Cir. 2010). Two types of procedural irregularities could trigger application of the de novo standard See Messick v. McKesson Corp. , 640 Fed.Appx. 796, 798 (10th Cir. 2016). First, de novo review is appropriate if a plan administrator "failed to issue a decision in the highest-level administrative appeal." Id. Second, the less deferential standard is appropriate where a plan administrator issued a decision "long after the applicable deadline." Id.
However, in considering whether irregularities exist, the Tenth Circuit has noted that "inconsequential violations" of procedural requirements would not entitle beneficiaries to de novo review. Gilbertson v. Allied Signal, Inc. , 328 F.3d 625, 635 (10th Cir. 2003). As long as an "ongoing, good *1266 faith exchange of information between the administrator and the claimant" takes place, minor procedural irregularities will not entitle Ms. Calderon to de novo review. Id.
In this case, the policy mandated that Hartford had to make an initial benefits determination "no more than 90 days after receipt of the properly filed claim." ( Id. ). Under "special circumstances," the insurance company could make a request for another 90 days. ( Id. ). The request had to be in writing, identify an expected date by which Hartford would make a decision, and be made before the expiration of the 90-day time period. ( Id. ). However, even if the insurance company received an extension, it had to make a decision "no more than 180 days after [the] claim was received." ( Id. ). Similarly, the plan provided that Hartford had to render a decision regarding an appeal within 60 days of receipt. ( Id. ). Under special circumstances, the insurance company could seek an extension of 60 days. ( Id. ). Again, the request had to be in writing, give the date by which Hartford expected to render a decision, and be made before the expiration of the 60-day time period. ( Id. ). In any event, the insurance company had to make a decision regarding the appeal within 120 days of receipt. ( Id. ).
Even though the policy vested Hartford with decision-making authority, Ms. Calderon contends that de novo review is appropriate in this case because Hartford failed to comply with the procedural requirements described above. Specifically, Hartford failed to issue a decision regarding Hartford's benefits claim until 195 days after receipt. (Doc 18 at 14). Likewise, Hartford failed to respond to the document Ms. Calderon captioned as an "appeal" until 122 days after receipt. (Doc. 18 at 14). In response, Hartford suggests any failure to comply with procedural deadlines was inconsequential in this case. Specifically, Hartford suggests it engaged in an "on-going, good-faith exchange of information" with Ms. Calderon while considering her claim. (Doc. 21 at 13-14). According to Hartford, any delay in deciding her claim was the product of Hartford's ongoing effort to obtain necessary documentation such as an autopsy report and toxicology report. (Id. ). Moreover, Hartford notes that its decision regarding Ms. Calderon's benefits claim came a mere 15 days after 180-day deadline mandated by the plan. (Id. at 12). Likewise, Hartford argues it only exceeded the 120-day deadline to respond to an appeal by 2 days. (Id. ).
Hartford correctly recognizes de novo review is improper where an insurance company only committed minor procedural violations. However, the Court does not believe the delays in this case are as minor as Hartford contends. While Hartford suggests it only ran afoul of the plan-imposed deadlines by a few days, it fails to acknowledge that the 180-day and 120-day deadlines were only applicable if Hartford properly sought an extension. Hartford first acknowledged receipt of Ms. Calderon's initial benefits claim on October 10, 2016. (Doc. 17-1 at 22). It failed to inform Ms. Calderon that it would need an extension until March 10, 2017. (Doc. 17-1 at 21). Thus, it did not request an extension until 5 months after it acknowledged receipt of her claim. This delay appears to be a clear violation of the 90-day time limit discussed above. Likewise, after Hartford received the document Ms. Calderon captioned as an "appeal," if failed to issue any response until October 10, 2017, a date far past the 60-day time limit imposed by the plan. Moreover, Hartford apparently never informed Ms. Calderon that it would need an extension to respond to this document or provided an estimated date by which it would render a decision regarding the appeal.
*1267 In doing so, Hartford violated the procedural requirements set forth in the plan. As such, the Court finds Hartford procedural violations were not minor. Hartford did not merely run afoul of plan-imposed deadlines by a couple days. Hartford violated procedural requirements in a clear and significant manner. For these reasons the Court will apply the de novo standard of review.
DISCUSSION
In denying Ms. Calderon's claim, Hartford cited two policy provisions. (Doc. 17-1 at 17-18). In analyzing Ms. Calderon's motion, the Court will consider whether either of those provisions served as an adequate basis for denying benefits.
I. An Accident Independent of All Other Causes
The Court first considers whether Mr. Calderon's death occurred "independently of all other causes" even though he was intoxicated at the time of the crash. While the Tenth Circuit has not analyzed language that mirrors the provision in this case, in LaAsmar v. Phelps Dodge Corporation Life, it did consider whether a decedent's blood-alcohol content could preclude coverage under a similar provision in an ERISA benefits plan.[4] 605 F.3d 789, 801 (10th Cir. 2010). In that case, an insured party died in a single-vehicle rollover in Grand County, Colorado. Id. at 794. At the time of the crash, the insured party was intoxicated, with a blood-alcohol level of .227 percent. Id. at 808. Thus, his blood-alcohol level was almost three times Colorado's legal limit. Id. at 794.
Following this death, the parents of the decedent, who were beneficiaries under his ERISA benefits plan, filed a claim with Metropolitan Life Insurance Company, and the defendant insurance company denied coverage. Id. at 794-95. In doing so, Metropolitan Life relied in large part on policy language that mandated that the crash must have been "the sole cause of the loss." Id. at 801. Given the insured's high blood-alcohol level, Metropolitan Life reasoned that his intoxication contributed to the loss. Id. On appeal, the Tenth Circuit noted that Metropolitan Life's conclusion conflicted with the plain language of the policy. Id. at 801-02. The court found the policy language required the insurance company to inquire into the cause of the death, not the cause of the crash. Id. In that case, the insured's death certificate indicated he died from "head and internal injuries suffered in a motor vehicle crash," not intoxication. Id. at 795. On this basis, the Court concluded the crash was the "sole cause of the loss." Id. at 801-02. Thus, the court found Metropolitan Life erred in denying benefits to the insured's parents. Id.
The LaAsmar Court's conclusion on this issue is persuasive to this case. While the language in the instant policy provision is slightly different than the language at issue in LaAsmar, it effectively mandates that the crash be the sole cause of the injury. Indeed, the language at issue provides that Hartford will only cover accidental losses that occurred "independently *1268 of all other causes." Moreover, like Metropolitan Life, Hartford denied Ms. Calderon's claim because Calderon had a blood alcohol content of .2 percent at the time of the crash. Given Mr. Calderon's intoxication, Hartford concluded his intoxication was a contributing cause of his death and denied benefits.
Under LaAsmar, Hartford's conclusion on this issue cannot stand. Like the death certificate at issue in LaAsmar, Calderon's death certificate indicated that the cause of his death was "multiple blunt force injuries." (Doc. 17-1 at 297). Reports from the Office of the Medical Investigator of the University of New Mexico back up this conclusion. (Doc. 22-1 at 20, 22). These reports also indicate that "blunt force injuries" caused Mr. Calderon's death. (Id. ). None of these documents indicate Calderon's intoxication was the cause of his death. Therefore, much like the insurance company in LaAsmar, Hartford erred in concluding that Calderon's death was not the direct result of an accident that occurred independently of all other causes.
II. A Loss that was Caused or Contributed by an Injury Sustained While Intoxicated
Despite the Court's holding regarding Hartford's conclusion as to the provision described above, the Court's analysis is not complete. In denying Ms. Calderon's claim, Hartford also relied on another policy provision that that excluded coverage for death "caused or contributed to" by "injury sustained while intoxicated." The Court will consider whether this provision precludes recovery.
A. Causal Requirement
It does not appear that the Tenth Circuit has considered this issue. However, other courts around the country have weighed in on the meaning of similar or identical intoxication exclusions. Several courts have indicated that exclusions like the one described above contain an implicit causation requirement that require insurance companies to identify a connection between the injury and the insured's intoxication before denying benefits. See, e.g., Hastie v. J.C. Penney Life Ins. Co. , 115 F.3d 895, 897 (11th Cir. 1997) (stating that interpreting an intoxication exclusion in a manner that would bar recovery based on the intoxicated status of an individual would amount to an unreasonable construction); Papotto v. Hartford Life & Accident Ins. Co. , 2011 WL 6939331, at *4-6, 2011 U.S. Dist. LEXIS 149658, at *12-16 (D. N.J. Dec. 30, 2011) (holding that an exclusion that barred recovery for "any loss caused or contributed to by ... injury sustained while intoxicated" contained a causation requirement).[5] However, other courts have held insurance companies can draft provisions that effectively serve as absolute bars to recovery where an insured party sustained injury while intoxicated, regardless of whether any causal connection exists. E.g., Graham v. Western Ky. Navigation, Inc. , 2000 WL 1234319, at *1-3, 2000 U.S. App. LEXIS 22250, at *7-10 (6th Cir. 2000) (concluding district court acted reasonably in holding that exclusion which barred recovery for liabilities incurred "while legally intoxicated" did not contain a causation requirement);
*1269 James-Smith v. Total Affiliates Accidental Death & Dismemberment Ins. Plan, 2011 WL 4899992, at *6, 2011 U.S. Dist. LEXIS 118474, at *14 (N.D. Ohio Oct. 13, 2011) (recognizing that an alcohol exclusion that contains no causation requirement serves as an "absolute bar" to recovery for any injury incurred while intoxicated).
Given the language in the policy at issue, the Court finds the cases that have found a causation requirement persuasive. The Court believes the District of New Jersey's decision in Papotto to be particularly instructive and relevant to the present case. In Papotto , the court held that an exclusion in a Hartford policy that barred recovery for any "loss caused or contributed to by ... injury sustained while intoxicated" contained an implicit causation requirement. Papotto, 2011 WL 6939331, at *1, *4, 2011 U.S. Dist. LEXIS, at *1-2, *10. The court grounded this conclusion in the reasonable expectations of the insured. Id. at *4-5, 2011 U.S. Dist. LEXIS, at *10-13. According to the Papotto Court, a reasonable person would expect a provision that explicitly references "cause" to demand a causal connection between the intoxication and the injury. Id. at *5, 2011 U.S. Dist. LEXIS, at *13. Under Hartford's interpretation, an "intoxicated individual fatally struck by lightning while safely relaxing in the comfort of his home would be denied coverage." Id. No reasonable insured party would expect this unusual result. Id. at *4-5, 2011 U.S. Dist. LEXIS, at *10-13. For these reasons, the Papotto Court concluded Hartford's interpretation of the intoxication exclusion to bar recovery was unreasonable. Id. at 16.
This analysis is similar to the present case. First, the language at issue in Papotto is nearly identical to the alcohol exclusion at issue in this case. Indeed, that case also involved a policy issued by Hartford. Moreover, the Court agrees with the District of New Jersey's conclusion that the exclusion's reference to "cause" or "contribution" would lead any reasonable insured to believe the exclusion would only apply if there was some relationship between the intoxication and the accident. While the language could be a bit confusing to a reader who simply focuses on the phrase regarding "injury sustained while intoxicated," the Court simply does not believe a reasonable insured would expect the per se rule that Hartford desires to enforce.
Moreover, the Court would note that Papotto 's reasoning appears to be the most natural extension to Tenth Circuit case law addressing different, but related issues in benefits denial claims under ERISA. While the Tenth Circuit has not determined whether intoxication exclusions contain a causation requirement, it has frowned upon attempts to deem all deaths that occur while an insured is intoxicated as "non-accidental" within the meaning of a policy. LaAsmar, 605 F.3d at 802. Given the Tenth Circuit's reluctance to enforce per se rules in the context of this closely related issue, the Court believes it would not impose a per se rule regarding intoxication based on the language in the policy. For all these reasons, the Court believes that the exclusion at issue includes a causation requirement.
B. Causal Requirement Applied to this Case
In light of this conclusion, the Court now considers whether a causal connection existed between Calderon's death and his intoxication. In its initial denial of Ms. Calderon's claim, Hartford cited to three documents: 1) a death certificate from the State of New Mexico, 2) a toxicology report, and 3) a police report. (Doc. 17-1 at 17-20). Hartford cited the first two documents mainly to note that Calderon had a high blood-alcohol level at the time of the accident and that he died from blunt force injuries. (Id. at 18). Certainly, these documents alone do not demonstrate causation. Hartford cited the crash report to *1270 support the proposition that "Sebastian Calderon had been at the Red Door Brewery" on the night of the accident. (Id. ). Moreover, Hartford noted the crash report demonstrates the collision was caused by another driver's failure to yield the right of way to Calderon. (Id. ). According to Hartford, "Mr. Calderon's level of intoxication likely would have affected his ability to reasonably respond and react to the vehicle pulling in front of him which may have reduced the severity of the collision." (Id. ). Hartford took this language from a statement made by Officer Robert Liccione, one of the responding officers, in a supplementary offense report compiled months after the accident. (Doc. 22-1 at 50).
The Court finds Hartford's reliance on this statement from the supplementary report problematic. As Ms. Calderon suggests, the officer's comment in the supplementary report amounted to speculation and conjecture. The officer failed to point to any proof that Calderon's intoxication actually impaired his ability to react. Indeed, other statements in the supplementary report refute this assertion. For example, Mr. Liccione notes that he spoke with several witnesses after the accident. One witness, Alexander Gardner, was also traveling northbound, in the same path travel as Mr. Calderon, at the time of the accident. (Id. at 48). Mr. Gardner indicated that "[a]s Mr. Calderon was travelling northbound, a vehicle pulled out in front of him from the east." (Id. ). According to Mr. Gardner, Mr. Calderon did not have a chance to avoid the collision. (Id. ). Another witness, Aurora Garcia, met Mr. Calderon for drinks at the Red Door Brewery before the collision. (Id. ). She left the brewery at the same time as Mr. Calderon, and "was following Mr. Calderon when they proceeded through the green light at Montgomery." (Id. ). According to Ms. Garcia, the crash occurred because "a vehicle pull[ed] out in front of Mr. Calderon from the east." (Id. at 49).
These statements are also supported by the New Mexico Uniform Crash Report, which was prepared by the primary responding officer, Officer Danius, on the day of the accident. In describing the cause of the accident, Officer Danius indicated that "driver inattention" and failure to yield the right of way were contributing factors. (Doc. 22-1 at 15). Moreover, that report indicates that three witnesses, including Calderon's wife, told the officer that "there was not enough time" for Calderon to avoid the collision. (Doc. 22-1 at 16). While the Court agrees that Mr. Calderon's blood alcohol content is certainly troubling, it simply cannot conclude that his intoxication caused or contributed to his death in the absence of reliable evidence to support this proposition. For this reason, the Court believes Hartford erred in denying benefits under the applicable intoxication exclusion.
III. Attorney's Fees
Ms. Calderon seeks attorneys' fees in this case. ERISA provides that in any action by a beneficiary, "the court in its discretion may allow a reasonable attorney's fees and costs and costs of action to either party." 29 U.S.C. § 1132(g)(1) (2018).
The Tenth Circuit has articulated factors for courts to consider in determining whether an award of attorney's fees is proper:
(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to personally satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants *1271 and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.
Gordon v. United States Steel Corp. , 724 F.2d 106, 109 (10th Cir. 1983).
While the Tenth Circuit has recognized that attorney's fees are proper in some instances, it has also stated that Fed. R. Civ. P. 54 applies to claims for attorney's fees in ERISA litigation. Under that rule, "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). Unless a "statute or court order provides otherwise," parties should typically make this motion after entry of judgment. Fed. R. Civ. P. 54(d)(2)(B).
Aside from the Federal Rules, the District of New Mexico's local rules provide procedures that parties must follow in filing a motion for attorney's fees. Under D.N.M.L.R.-Civ. 54.5(a), motions for attorney's fees "must be filed and served within thirty (30) days after entry of judgment." Additionally, these motions must include "a supporting brief and evidence (affidavits and time records.)" D.N.M.L.R.-Civ. 54.5(b).
At this time, the Court will not consider Ms. Calderon's request for attorney's fees. Ms. Calderon may seek attorney's fee under the provisions of the Federal Rules of Civil Procedure and the District of New Mexico Local Rules.
IV. Prejudgment Interest
Finally, the Court will address Ms. Calderon's argument regarding prejudgment interest. ERISA permits an award of prejudgment interest "to compensate the injured party." Allison v. Bank One-Denver, 289 F.3d 1223, 1243 (10th Cir. 2002). District courts have discretion in determining whether a prejudgment interest award is proper. Caldwell v. Life Ins. Co. of N. Am. , 287 F.3d 1276, 1288 (10th Cir. 2002). However, a court should not grant prejudgment interest unless the award is "equitable." Allison, 289 F.3d at 1243.
Here, Hartford should have awarded Ms. Calderon benefits in 2016 or 2017, but failed to do so. As such, the Court believes an award of prejudgment interest is equitable in this case. Moreover, Hartford failed to address Ms. Calderon's argument for prejudgment interest in its response. As such, the Court has no reason to believe prejudgment interest would be inappropriate in this case.
Given this conclusion, the Court must determine the appropriate rate of prejudgment interest. Ms. Calderon suggests this issue is governed by the rate set forth in N.M. Stat. Ann. § 56-8-3. (Doc. 18 at 25). While Hartford fails to address prejudgment interest in its response, at the hearing, it argued this case should be governed by the "federal rate." Unfortunately, neither party has cited the appropriate rate. As Ms. Calderon impliedly notes, district courts commonly look to state rates in calculating prejudgment interest if the rates set forth in those statutes do not grant punitive awards. Weber v. GE Group Life Assur. Co. , 541 F.3d 1002, 1016 (10th Cir. 2008). Thus, Hartford's contention that the Court should look to the "federal rate" does not carry any weight. However, though Ms. Calderon correctly notes the Court can utilize fixed rates in state statutes, she cites the incorrect state statute. N.M. Stat. Ann. § 56-8-3. indicates that prejudgment interest rates cannot exceed "more than fifteen percent" in a variety of enumerated cases. N.M. Stat. Ann. § 56-8-3 (2018). Thus, it merely sets a maximum interest rate that *1272 the Court cannot exceed in awarding prejudgment interest. It does not set a fixed interest rate. Conversely, N.M. Stat. Ann. § 56-8-4(A) provides that "[i]nterest shall be allowed on judgments and decrees for the payment of money from entry and shall [generally] be calculated at the rate of eight and three-fourths percent per year." N.M. Stat. Ann. 56-8-4(A) (2018). Courts should only decline to fix interest at 8.75 percent if: 1) the contract provides a different calculation or 2) the "judgment is based on tortious conduct, bad faith or intentional or willful acts." Id. In the latter case, the Court should compute interest at a rate of "fifteen percent." Id.
As stated above, the Court believes prejudgment interest is proper in this case. In calculating interest, the Court sees no reason to deviate from the 8.75 percent provided in New Mexico law. The Court does not believe this amount would be punitive. Moreover, the policy does not appear to fix a rate for prejudgment interest, and Ms. Calderon has not established bad faith or any other factor to suggest 15 percent is proper. Thus, the Court will calculate interest using the 8.75 percent figure.
Finally, the Court must determine the appropriate dates for calculating prejudgment interest. Ms. Calderon contends prejudgment interest should run from August 31, 2016, the date of Mr. Calderon's death, to the date of payment. (Doc. 25 at 25). Ms. Calderon is wrong. In the context of ERISA disability claims, the Tenth Circuit has recognized that "prejudgment interest should run from the date the claim for benefits was first filed." Caldwell v. Life Ins. Co. of N. Am. , 287 F.3d 1276, 1287 (10th Cir. 2002). The Court believes that rule should apply in benefits denial cases as well. Indeed, that rule recognizes that prejudgment interest "seeks to make persons whole for the loss suffered because they were denied use of money to which they were legally entitled." Id. Ms. Calderon was not legally entitled to any money on August 31, 2016, as she had not yet made a claim. Accordingly, prejudgment interest will run from September 29, 2016, the date Ms. Calderon filed her claim with Hartford, to the date of payment.
V. Conclusion
For these reasons, the Court concludes Hartford wrongfully denied Ms. Calderon benefits. Hartford incorrectly concluded that Mr. Calderon's death was not an accident that occurred "independently of all other causes." Likewise, Hartford erred in determining coverage was unavailable under the intoxication exclusion. Therefore, summary judgment in favor of Ms. Calderon is proper. Since Hartford wrongfully denied benefits, Ms. Calderon is entitled to prejudgment interest.
IT IS ORDERED that Ms. Calderon's Motion for Summary Judgment is GRANTED. Harford shall pay Ms. Calderon the applicable benefits for Mr. Calderon's death.
IT IS FURTHER ORDERED that Ms. Calderon shall receive prejudgment interest at a rate of 8.75 percent to run from September 29, 2016 to the date of payment.

In this case, the Court is reviewing a decision to deny accidental death and dismemberment benefits by Hartford Life and Accident Insurance Company. Hartford submitted an administrative record to this Court on October 29, 2018. (Doc. 17-1). Later, Ms. Calderon filed a Motion to Clarify the Administrative Record. (Doc. 22). With that motion, she sought to provide clearer copies of several documents that already existed in the Administrative Record. (Doc. 22). The Court granted the Motion. (Doc. 23). As such, the Court occasionally cites to the exhibit attached to her motion (Doc. 22-1) as part of the Administrative Record, while it references the original Administrative Record when it analyzes documents that were not affected by her motion. (Doc. 17-1).

Given the procedural history outlined above, there seems to be a question whether Ms. Calderon exhausted her administrative remedies. Ms. Calderon captioned her June 8, 2017 document as an "appeal," but Hartford's June 14, 2017 and October 10, 2017 responses suggest the company viewed Ms. Calderon's document as a supplementation to her initial benefits claim. (Doc. 22-1 at 1; Doc. 17-1 at 13-16). However, Hartford never filed a motion to dismiss on the grounds of Ms. Calderon's alleged failure to exhaust. Moreover, at the Court's February 11 hearing, Hartford noted that it was not arguing dismissal was proper based on the potential exhaustion issue. For these reasons, the Court believes is may properly consider the merits of this suit.

Ms. Calderon also takes issue with Hartford's alleged "lack of thoroughness" in analyzing her claim. For example, Ms. Calderon notes that Hartford inaccurately described the accident in its denial letter where it suggested her husband was travelling northbound, attempting to make a left-hand turn at the time of the collision. (Doc. 18 at 11). Ms. Calderon claims these inaccuracies are significant, because Hartford operated under a "conflict of interest" when it evaluated her claims. (Id. ). Where an insurance company both evaluates and pays claims, courts "may allocate significant weight to a conflict of interest where the record reveals a lack of thoroughness." Murphy v. Deloitte & Touche Group Insurance Plan , 619 F.3d 1151, 1163 (10th Cir. 2010). However, Ms. Calderon fails to acknowledge that courts typically only give weight to a conflict of interest if they use an arbitrary and capricious standard of review. See Scruggs v. ExxonMobil Pension Plan, 585 F.3d 1356, 1361 (10th Cir. 2009). For reasons articulated below, this Court will apply a de novo standard for review. Thus, it does not believe the alleged conflict of interest or Hartford's lack of thoroughness are dispositive issues in this case.

Hartford contends the Court should not look to this case because the LaAsmar Court applied the doctrine of contra proferentem. (Doc. 21 at 16). Under that doctrine, a Court will construe all ambiguities in an insurance policy against the drafter when reviewing a claim de novo. LaAsmar , 605 F.3d at 805. As Hartford notes, courts do not apply that doctrine when they use an arbitrary and capricious standard of review. (Doc. 21 at 16) (citing Kimber v. Thiokol Corp. , 196 F.3d 1092, 1100 (10th Cir. 1999) ; Adamson v. Unum Life Ins. Co. of Am. , 455 F.3d 1209, 1215 (10th Cir. 2006) ). Since the Court elected to use a de novo standard of review, Hartford's arguments on this issue are immaterial.

Hartford contends the reasoning in Hastie is inapplicable to the present case because it was "a non-ERJSA case applying Florida law." (Doc. 21 at 20). The Court believes the case is still helpful to resolve this issue. Regardless of whether a plan is governed by ERISA, a reasonable insured simply would not expect the interpretation Hartford suggests.